# CHARLESTON.

JOHN L. ALLEN *et al.* v. COLONIAL OIL COMPANY

Submitted January 16, 1923.      Decided January 23, 1923.

1. MINES AND MINERALS—*Implied Covenants in Lease Only Justified on Grounds of Legal Necessity to Effectuate Purposes Thereof.*

   Implied covenants in a lease for oil and gas are those only which upon grounds of legal necessity the courts may read into the contract for the purposes of effectuating the manifest purposes and intentions of the parties thereto.  (p. 695).

2. SAME—*Unless Discretion of Lessee in Further Drilling After Oil or Gas Found, Greatly Abused, Omission to Accelerate Operation and Ground for Complete or Partial Cancellation.*

   Generally, when a lessee in an oil and gas lease has kept and performed all the covenants and agreements therein, and has found oil or gas, and the lessor is being paid the rents or royalties stipulated in the contract, the work of further drilling and boring for oil is left to the sound judgment and reasonable discretion of the lessee, exercised for the

mutual advantage of the parties, and in the absence of allegation and proof of great abuse of such discretion, or of actual fraud, his omission to accelerate his operations on the leased premises affords no ground for complete or partial cancellation of the lease. (p. 695).

3. SAME—*Bill for Cancellation of Lease for Breach of Covenants to Drill Additional Wells or to protect from Drainage Must State Facts Clearly Showing Necessity for Further Operations and Profit Therefrom.*

When a lessor seeks relief by cancellation in whole or in part of such lease for alleged breaches of the lessee's implied covenants to drill additional wells or to protect the property from drainage, he must in his bill allege facts and circumstances showing the propriety and necessity for such further operations, and that when the additional wells are drilled the lessee will be able to operate them at a fair profit to himself. (p. 696).

4. SAME—*Bill for Cancellation of Lease Based on Theory of Drainage by Adjacent Wells Not Showing Drainage in Substantial Quantity, Bad on Demurrer.*

A bill for relief by cancellation of a lease in whole or in part, based on the theory of drainage by wells on adjacent lands, which does not state facts showing with reasonable certainty drainage in substantial quantities, is bad on demurrer, and the demurrer should be sustained. (p. 696).

5. SAME—*Neither Facts Alleged Nor Proof Held to Justify Cancellation of Lease in Whole or in part, Prayed to be Removed as Cloud on Title.*

In this case neither the facts alleged nor those developed on the proof present a case justifying cancellation in whole or in part of the lease which the bill prays may be removed as a cloud upon plaintiff's title. (p. 696).

6. SAME—*To Justify Cancellation of Lease for Breach of Implied Covenants, Lack of Diligence in Development and Extraordinary Hardship Must be Alleged and Proved.*

To justify cancellation of a lease based upon alleged breaches of implied covenants only, due to lack of diligence in the development of the leased premises, a case of extraordinary hardship must be alleged and proved. (p. 699).

(McGINNIS, JUDGE, absent).

Appeal from Circuit Court, Tyler County.

92 W. Va.

Suit by John L. Allen and others against the Colonial Oil Company. From a decree for plaintiffs, defendant appeals.

*Reversed and bill dismissed.*

*Ambler, McClure & Ambler,* for appellant.

*R. E. L. Allen, Underwood & Moore,* and *J. M. Ritz,* for appellees.

MILLER, PRESIDENT:

The bill is to remove as a cloud upon plaintiffs' title to a tract of 614 acres of land in Tyler County a certain lease thereon for oil and gas, made by Osborn Allen, their ancestor to L. C. Sands, on April 12, 1894, and assigned by the lessee to the Paova Oil Company, which company, after drilling three wells thereon, the first completed in the Big Injun Sand August 1, 1894, a gas well, the second, a small oil well, completed in the Big Injun Sand in October or November 1896, the third, also a small gas well, completed in the Big Injun Sand early in 1897, since then exhausted and no longer productive of oil or gas, assigned the said lease in December 1900, to the defendant Colonial Oil Company, reserving, however, well No. 1.

After the assignment of the said lease to the Colonial Oil Company, it drilled three other wells on the leased premises; the first, designated as Number 4, a gas well of considerable proportion, completed in the Big Injun Sand about March 1902; the second, Number 5, an oil well of small production, completed in the Maxon Sand in 1915; the third, known as Number 6, completed in February 1917, also in the Maxon Sand, barren and unproductive of either oil or gas.

The several theories which the plaintiffs advanced in their bill and on which they sought the relief prayed for were; (a) that the defendant had abandoned the said lease or the particular portions thereof on which no wells had been drilled; (b) that they had breached, not any specific covenant, but the implied covenants to properly protect said land from drainage through wells on adjoining lands; (c) that they had failed to perform, not any specific covenant,

but the implied covenant to reasonably and properly develop the premises for oil and gas by drilling other wells.

The prayer of the bill was to set aside and remove said lease as a cloud upon plaintiffs' title to the entire tract, or in the event the court should be of opinion that defendant had not abandoned all its rights but should be protected as to the wells thereon and yet producing oil or gas, that said lease should be canceled and set aside except as to a reasonable boundary surrounding each of said producing wells; and there was a prayer for general relief.

By the decree now complained of the court overruled defendant's demurrer to the bill, and did in accordance with the prayer thereof, thereby cancel, set aside and annul and hold the same for naught in so far as it related to the oil and gas rights pertaining to the Gordon Sand and underlying said 614 acres, and that it be wholly set aside, canceled and annulled in all respects and as to all other rights, except as to said wells numbered 1, 4 and 5, together with sufficient land surrounding them as should be reasonably necessary to protect the same from drainage from wells drilled and operated on the remainder of said tract; and the cause was referred to a commissioner for the purpose of ascertaining and reporting to the court the facts necessary to protect the defendant in the rights thus reserved.

Appellant relies upon and urges consideration of its demurrer to the bill. The lease, exhibited with the bill, in consideration of one dollar thereby acknowledged did thereby "grant unto the lessee, his heirs and assigns all the oil and gas in and under" said tract of land, "and also demise said tract of land for the purpose and with the exclusive right of operating thereon for said oil and gas, together with rights of way, * * * for the term of five years from the date thereof, and as long thereafter as oil and gas are found in paying quantities thereon, yielding and paying to the lessor the one eighth (1/8) part of all the oil produced and saved from the premises, in tank or in pipe lines to the lessor's credit, and should any well produce gas sufficient to market, the lessor shall be paid at the rate of two hundred dollars

($200.00) per year for such well so long as the gas is sold therefrom.''

The one condition of defeasance or forfeiture stipulated in the lease was that if no well should be commenced within thirty days from the date thereof, the same should be null and void.

The only specific covenants therein were; (a) that in case the first well should be a paying producer, the lessee agreed to commence a second well within thirty days; (b) that the lessor should have free gas for domestic purposes in case there should be more than sufficient to operate the lease; (c) that no well should be drilled within ten rods of any building then located on the property, without the consent of the lessor; (d) that the lessee should prosecute with due diligence the drilling of the test well and avoid as far as possible any delay in the work.

A brief analysis of the bill for the purposes of the demurrer is as follows: The making of the lease with the provisions already recited; the completion of well No. 1, still producing gas, No. 2, which produced gas for six years, and No. 3, in which gas was also found; that after No. 3 was completed the Colonial Oil Company acquired the leasehold except well No. 1, and drilled No. 4 in March 1901; that both No. 1 and No. 4 were still producing gas; that after No. 4 was drilled, plaintiffs frequently demanded further drilling; that in 1915 defendant did drill No. 5 to the Maxon Sand, 1600 feet, which is still producing oil; that plaintiffs frequently urged further drilling, and that defendant declined to drill; that said land is underlaid with three oil producing sands or strata, the Maxon at 1600 feet, the Big Injun at 1900 feet, and the Gordon at 2600 feet; that no well was ever drilled to the Gordon; that five wells were drilled to the Big Injun, and one to the Maxon; that said farm is a productive oil and gas field; that 735 feet east and 300 feet from the southern line of the tract is a producing well on the Jesse White land, and that there are other wells on the White land, 600 feet from the 735 foot well; and that there are producing wells east and north of the farm, and a large gas well 400

north of the 614 acre tract on the Stoneking land; that a mile west of this tract is a large oil and gas field, on which oil and gas is being produced from these sands, and that a mile south is another oil and gas field; and upon information and advice of counsel, the bill alleged that the oil and gas underlying the 614 acre tract is being drained by the wells on the Stoneking land and by the oil and gas wells on the Jesse White land, in which suction pumps are used.

The bill then proceeds to allege what in the opinion of the plaintiffs should be done to properly protect their land, as follows: That at least one well should be drilled through the Gordon Sand to offset the well on the Stoneking on the north; at least two wells to offset the Big Injun wells on the White tract; and that six other wells should be drilled through the Gordon Sand; and if oil or gas should be found in any of them, then additional wells should be drilled as circumstances would require. It is alleged that the farm is a parallelogram 7200 feet long and 4000 feet wide; that No. 1 well is 1300 feet north of the southern boundary line of said tract and is the most northerly well thereon now producing except No. 4, which is 139 feet from the northern line, and that all the intervening territory, except No. 3, which was drilled in the center of the tract, has been abandoned, and that the lease as to all such intervening territory should be canceled and set aside as a cloud.

This brief recital of the substantial allegations of the bill shows the absence of any charges of breaches of the specific covenants of the lease. There is a concessum that every one of these covenants and conditions of the continuance of the lease have been performed or fulfilled; and the only ground on which relief in whole or in part is predicated are alleged breaches of implied covenants, (1) to properly develop the property, and (2) to protect the land from drainage from operations on adjoining lands, both of which covenants, it is alleged, have been breached by the defendant company, and lastly the general theory of abandonment.

Do these allegations of the bill make a case for the relief prayed for? We must consider the fact that the lease in

question was made in 1894, when, so far as the bill shows, the territory surrounding it was undeveloped. The parties might then have contracted a lease conditioned on the drilling of a specific number of wells and at certain intervals of time, but they did not do so. The contract specifically provided for only a test well, and then a second well if the first should prove to be a producer. The courts can not make new contracts for parties. They can only interpret and enforce them, with any implied covenants necessary to accomplish the manifest purpose of the instrument. It is wholly improbable that the lessor in 1894 would have found any one to undertake the burdensome obligation of puttting down wells according to the present demands of the plaintiffs.

Implied covenants, as the authorities say, are only justified on grounds of legal necessity, and to effectuate the purposes of the contract. *Grass* v. *Big Creek Development Company*, 75 W. Va. 719. All authorities oppose the reading in of matter not expressed, when it is not necessary in some way or for some reason. *White* v. *Bailey*, 65 W. Va. 573; *Grass* v. *Big Creek Development Company, supra,* 734 and cases cited. As long as the lessor in an oil and gas lease gets the consideration for the lease, in this case the rentals for gas wells drilled and the royalty oil, according to the contract, he gets what he specifically contracted for, and there is no necessity for interpreting into the lease a covenant to drill more wells in order to furnish a consideration for the lease.

Generally, as our cases hold, after a lessee has fulfilled all the specific covenants and conditions of the lease, and has thereby become invested with an estate or interest in the land, work of further development is, in the absence of specific covenants to the contrary, referred to the sound judgment and reasonable discretion of the lessee exercised for the mutual advantage of the parties to the contract, and in the absence of allegations and proof of great abuse of such discretion or of actual fraud, his omission to fully operate the premises affords no ground for complete or partial cancellation. *Hall* v. *South Penn Oil Company,* 71 W. Va. 82. In *Grass* v. *Big Creek Development Company,* supra, we said that the judg-

ment of the operator as to the diligence with which and the extent to which wells should be drilled thereunder upon discovery of either mineral in paying quantities, will control, if exercised in good faith and not unreasonably or arbitrarily to promote his own particular benefit to the manifest prejudice of the lessor. Both are bound by that degree of diligence which, the several circumstances and conditions being considered, would reasonably be expected of operators of ordinary prudence experienced and engaged in the same business.

The bill in this case discloses the sinking of six wells, necessitating the expenditure of large sums of money and the payment of all royalties or rents on oil and gas wells, and the performance of all specific covenants, though it alleges in general terms the failure of the lessee to sufficiently develop the property and to protect it from whatever drainage has resulted or may result from wells drilled on adjoining lands, it does not comply with the rules of good pleading, requiring the pleader not only to prove but to allege all the facts and circumstances showing the propriety and necessity of further drilling, in the interest and to the advantage of both parties to the contract. It is not enough to show that the lessee might be benefitted in some way. The pleader must show that under all the facts and circumstances the lessee would be justified at the particular time in incurring the great cost and expense of putting down additional wells. This would depend on the character of the particular lands, the nature of the oil bearing sands, the cost of drilling, proximity to market, and the reasonable prospects of being able to operate such wells at a fair profit to him. Without such showings by allegations and proof, the relief of cancellation should be denied. *Steel* v. *American Oil Development Company,* 80 W. Va. 206; *Jennings* v. *Southern Carbon Company,* 73 W. Va. 215; *Id.* 81 W. Va. 347; *Hall* v. *South Penn Oil Company, supra; Todd* v. *Manufacturers' Light & Heat Company,* 90 W. Va. 40.

In both the Hall and Todd cases it was held that to avoid a demurrer the bill must state facts showing with reason-

able certainty drainage in substantial quantities; and according to the Jennings case actual fraud on the part of the lessee depriving the lessor of the benefits of the oil so drained. In the first of the Jennings cases the bill was held good on demurrer. Subsequently, on the trial, the facts developed tended to show slight drainage but were found insufficient to justify the relief prayed for. In the absence of actual fraud charged, and in the absence of facts alleged showing intent to abandon, justifying cancellation, we do not think the bill here presents a good case for relief, and that the demurrer should have been sustained.

But on the merits we proceed to inquire, in the absence of adequate pleading, whether, in the face of the answer, averring literal compliance with every covenant expressed, denying any substantial drainage from the leased premises, alleging the uncertain, freaky and precarious character of the territory, as evidenced by well No. 6, though drilled on the faith of No. 5, still producing, and denying that defendant has declined to drill further wells as soon as the circumstances and conditions and production will justify, there was any justification for the decree. The answer alleges that the Paova Oil Company was managed by skilful operators and that its own operations have been administered by competent agents of long experience in the same neighborhood, and specifically denies any substantial drainage, and further alleges that when respondent purchased the property it was known that well No. 2 on the Jesse White tract, drilled to the Gordon Sand, produced nothing, and that a well drilled on the Dillon tract was likewise barren in the Gordon Sand, and that of the wells alleged to be draining the land of plaintiffs, the nearest in the Big Injun, 735 feet away, never produced one barrel per day, and that the three other wells located on the plat, though larger than the one 735 feet away, show a decrease as the plaintiffs' property is approached; that wells in the Big Injun cost before the war $7,000.00, and at the present time would cost over $10,000.00; and that every allegation respecting production and drainage by the Stoneking well is unsubstantial. It also denies that the

leased premises are surrounded by oil and gas wells producing oil and gas; and denies that a well should be drilled to offset the well on the Stoneking land; and alleges that the attempt would fail and that the cost of such a well would exceed the value of the oil or gas produced.

On the issues of law and fact thus presented the evidence wholly fails to show either actual or legal fraud. Besides one of the plaintiffs, R. E. L. Allen, a lawyer with some experience as an operator, only one witness was examined in behalf of plaintiffs on the question of the propriety and advisability of drilling other wells at the present time, namely, one A. J. Carl, a driller, who drilled wells Nos. 5 and 6 for defendant. His evidence is rather negative in character. He would not venture an opinion as to where an additional well between Nos. 2 and 5 should be located, although he thought it looked good. He had no idea what the cost would be. He did not venture the opinion whether or not a well would be profitable, but thought it would be "practicable."

Mr. Allen's evidence on the theory of abandonment relates to visits to see Mr. Gilbert L. Watson, president, in 1914, 1915 and 1918. He admits Watson did not say in so many words that his company would not drill other wells, only that at the particular time or times mentioned he did not think further drilling was justified. Watson himself testified that his company was intending to start another well, No. 7, but was stopped by notice from plaintiffs not to do so. He also described the character of the territory as alleged in defendant's answer, but said that his company had always dealt with the property according to their best judgment as good and conservative operators, with proper regard to their own and the interests of the lessors, and that the Colonial Oil Company would at the proper time in the proper way get all the oil and gas which could be produced safely and economically. Mr Allen, after giving his opinion of the existence of oil and gas in the land under lease and in surrounding lands, proffered his opinion, objected to, that the plaintiffs' lease has not been properly developed. But, as we have seen, the lessees did not contract to drill wells and

develop the property upon his opinion, but upon their own. That question was left to their reasonable judgment and discretion, and if exercised in good faith and not fraudulently, the lessors could not impose upon them a forfeiture on the theory of abandonment or fraud. Our cases hold that the opinions of the operators, in the absence of fraud, must be allowed to control in the matter of drilling after the discovery of oil and gas. *Grass* v. *Big Creek Development Company, supra; Steel* v. *American Oil Development Company, supra;* and other cases.

To justify cancellation of a lease upon grounds not stipulated, but upon implied covenants only, a case of extraordinary hardship, occasioned by lack of diligence in the development of the land leased for oil and gas, must be alleged and proven. General and indefinite allegations of such lack of diligence are insufficient. *Todd* v. *Manufacturers' Light & Heat Company, supra.*

Our conclusion upon the case made by pleadings and proof is that plaintiffs are not entitled to the relief of cancellation in whole or in part, of the lease in question.

*Decree reversed, and bill dismissed.*