633 S.E.2d 22

Estate of Garrison G. TAWNEY, by Lela Ann Goff, Executrix, Lela Ann Goff and Vernon B. Goff, Husband and Wife, Janice E. Cooper and Clifford R. Cooper, Husband and Wife, Larry G. Parker, John W. Parker, Richard L. Ashley, Myrtle Jones, by her Attorney–In–Fact, Orton A. Jones, Plaintiffs,

v.

COLUMBIA NATURAL RESOURCES, L.L.C., FKA Columbia Natural Resources, Inc., a Texas Corporation; Nisource, Inc., a Delaware Corporation; and Columbia Energy Group, a Delaware Corporation, Defendants.

No. 32966.

Supreme Court of Appeals of West Virginia.

Submitted: May 23, 2006.

Decided: June 15, 2006.

Marvin W. Masters, Esq., The Masters Law Firm, L.C., Michael W. Carey, Esq., George M. Scott, Esq., Robert E. Douglas, Esq., Carey, Scott & Douglas, P.L.L.C., Scott S. Segal, Esq., The Segal Law Firm, J. Thomas Lane, Esq., J. Mark Adkins, Esq., Bowles, Rice, McDavid, Graff & Love, Charleston, for Plaintiffs.

Timothy M. Miller, Esq., Joseph S. Beeson, Esq., Jessica A. Blake, Esq., Robinson & McElwee, P.L.L.C., Charleston, for Columbia Natural Resources, L.L.C.

Herschel H. Rose, III, Esq., Steven R. Broadwater, Esq., Rose Law Office, for Amicus Curiae Independent Oil and Gas Association of West Virginia, Inc.

Richard L. Gottlieb, Esq., Lewis, Glasser, Casey & Rollins, P.L.L.C., for Amicus Curiae West Virginia Oil and Natural Gas Association.

MAYNARD, Justice.

In this case, we address two certified questions from the Circuit Court of Roane County which we reformulate [1] into the following single question:

> In light of the fact that West Virginia recognizes that a lessee to an oil and gas lease must bear all costs incurred in marketing and transporting the product to the point of sale unless the oil and gas lease provides otherwise, is lease language that provides that the lessor's 1/8 royalty is to be calculated "at the well," "at the wellhead" or similar language, or that the royalty is "an amount equal to 1/8 of the price, net of all costs beyond the wellhead," or "less all taxes, assessments, and adjustments" sufficient to indicate that the lessee may deduct post-production expenses from

---

**1.** *See* Syllabus Point 3 of *Kincaid v. Mangum*, 189 W.Va. 404, 432 S.E.2d 74 (1993) (recognizing this Court's power to reformulate certified questions).

the lessor's 1/8 royalty, presuming that such expenses are reasonable and actually incurred.[2]

For the reasons that follow, we do not believe that the lease language set forth in the certified question permits CNR to deduct post-production expenses from the lessors' royalty payments.[3]

## I.

## FACTS

Plaintiffs below are the owners of oil and gas ("lessors") which have been leased to Defendant Columbia Natural Resources or a predecessor in interest ("CNR"). At least since 1993, CNR has taken deductions from Plaintiffs' 1/8 royalty for "post-production" costs. These costs include CNR's delivery of gas from the well to the Columbia Gas Transmission ("TCO") point of delivery, CNR's processing of the gas to make it satisfactory for delivery into TCO's transportation line, and losses of volume of gas due to leaks in the gathering system or other volume loss from the well to the TCO line.

The post-production deductions taken by CNR include both monetary and volume deductions. CNR took deductions from royalty owners in equal amounts regardless of the distance from the well to TCO's transportation line. Even though CNR sent royalty checks to the lessors with an accounting of the purported amount of gas produced from the well, the purported price for which the gas was sold, and the purported amount of the royalty, CNR did not disclose on the accounting statements that deductions were taken.

Lessors have brought a class action suit against CNR for damages due to the allegedly insufficient royalty payments. There are approximately 8,000 Plaintiffs with 2,258 leases of varying forms and types. According to CNR, at least 1,382 leases at issue have language indicating that the royalty payment is to be calculated "at the well," "at the wellhead," "net all costs beyond the wellhead," or "less all taxes, assessments, and adjustments." CNR moved for summary judgment on the basis that the above lease language is clear and unambiguous and allows the lessee to deduct the royalty owners' proportionate share of post-production expenses, provided such expenses are actual and reasonable.

By order of October 14, 2005, the circuit court denied CNR's motion for summary

---

**2.** In its order to this Court, the circuit court certified the following two questions:

> Where the royalty language is as set out in Exhibit A [see below], may a lessee of oil and gas in West Virginia deduct money and/or volume from the lessor's 1/8 royalty payments for post-production expenses, where the lease does not provide specifically that the lessee may take such deductions from the royalty?

The circuit court answered this question in the negative.

> Where in an oil and gas lease there is no specific provision allowing for deduction of post-production expenses[,] does language such as "wholesale market at the well," "amount realized at the well," "net revenue realized," "1/8 of price," "net of all costs beyond the wellhead," and other language as set forth in Exhibit A, grant to the lessee the right to deduct post-production expenses from the lessor's royalty (assuming for purposes of this question that such expenses were reasonable and actually incurred)?

The circuit court also answered this question in the negative.

Exhibit A, referred to in the circuit court's certified questions, contains, by our count, at least 35 different kinds of lease language. Significantly, the certified questions arise from CNR's motion for summary judgment which was denied. See W.Va.Code § 58–5–2 (1998) (indicating that "[a]ny question of law, including, but not limited to, questions arising upon the sufficiency of ... a motion for summary judgment where such motion is denied ... may ... be certified ... to the Supreme Court of Appeals for its decision"). CNR's motion requested summary judgment only as to leases with the language "at the well," "at the wellhead" (or similar language), or that the royalty is to be "one-eighth of the price, net all costs beyond the wellhead," or "less all taxes, assessments, and adjustments."

We agree with CNR that the certified questions formulated by the circuit court go beyond the scope of CNR's motion for summary judgment in that the questions include lease language never placed in issue by CNR's motion for summary judgment. Accordingly, we decline to answer the questions as certified and reformulate the questions as indicated in the text of this opinion.

**3.** At this point we wish to acknowledge the valuable contributions of Amici Curiae Independent Oil and Gas Association of West Virginia, Inc. and West Virginia Oil and Natural Gas Association who filed briefs in support of the position advanced by Columbia Natural Resources.

judgment and certified two questions to this Court which we have reformulated as indicated above.

## II.

### STANDARD OF REVIEW

■ This Court reviews a circuit court's answer to a certified question *de novo.* *See* Syllabus Point 1, *Gallapoo v. Wal–Mart Stores, Inc.,* 197 W.Va. 172, 475 S.E.2d 172 (1996) (holding that "appellate standard of review of questions of law answered and certified by a circuit court is *de novo* ").

## III.

### DISCUSSION

It is the position of CNR that the "at the wellhead"-type language at issue in this case is clear and unambiguous and provides that the lessee may deduct the post-production costs of gas from the lessors' 1/8 royalty payments. Specifically, CNR explains that "at the wellhead" language indicates that the gas is to be valued for the purpose of calculating the lessors' royalty at the wellhead. However, the gas is not sold at the wellhead. In fact, the gas is not sold until the lessee adds value to it by preparing it for market, processing it, and transporting it to the point of sale. Thus, CNR concludes that the only logical way to calculate royalties at the wellhead is to permit lessees to deduct the lessors' proportionate share of post-production expenses, i.e., transportation and processing costs, from the total price received by the lessee.

The lessors, in contrast, assert that the "at the wellhead"-type language at issue is either silent or ambiguous on the subject of the allocation of post-production costs between the lessor and the lessee, and thus the language should be construed against the lessee. Further, because the lease language does not expressly address the allocation of post-production costs, the lessors posit that, pursuant to the lessee's implied covenant to market the gas recognized in Syllabus Point 4 of *Wellman v. Energy Resources, Inc.,* 210 W.Va. 200, 557 S.E.2d 254 (2001), the lessee must bear all costs incurred in marketing

and transporting the gas to the point of sale. Thus, the lessors conclude that CNR was not permitted to deduct post-production costs from the lessors' 1/8 royalty but rather must bear all such costs itself.

Both the lessors and CNR cite for support cases from other states which indicate to us that courts are divided on the effect of "at the wellhead"-type language on the allocation of post-production costs between the lessor and the lessee. For example, in *Creson v. Amoco Production Co.,* 129 N.M. 529, 10 P.3d 853 (N.M.App.2000), the New Mexico court held that "at the well" language was sufficient to require the allocation of post-production expenses between lessor and lessee. The issue in *Creson* concerned specific language in a "Unit Agreement" which stated that royalties shall be based on the "net proceeds ... at the well." 129 N.M. at 531, 10 P.3d at 855. The agreement also contained a provision titled *"Royalty Owners Free of Cost "* (emphasis in the original) providing that "[t]his Agreement is not intended to impose, and shall not be construed to impose, upon any Royalty Owner any obligation to pay Unit Expense unless such Royalty Owner is otherwise so obligated." 129 N.M. at 532, 10 P.3d at 856. The lessors argued that post-production expenses were "unit expenses" under the Unit Agreement; thus, the lessees were not permitted to deduct those expenses from the sales price before calculating the royalties owed to the lessors. While the court recognized that some states do not permit post-production costs to be charged to the royalty owners, *citing Garman v. Conoco, Inc.,* 886 P.2d 652 (Colo.1994), it rejected this approach. Instead, the court determined that "the phrase 'net proceeds ... at the well' is unambiguous and means that Plaintiffs are entitled to royalties based on the value of the ... gas as it emerges at the wellhead." 129 N.M. at 533, 10 P.3d at 857. The court thus concluded that post-production, value-enhancing costs were properly included in calculating the royalty owed to the lessors.

The Colorado Supreme Court took the opposite approach in *Rogers v. Westerman Farm Co.,* 29 P.3d 887 (Colo.2001). The issue in that case dealt with the sufficiency of

the lease language "at the well" or "at the mouth of the well" to determine the proper allocation of costs between the parties of the post-production expenses of gathering, compressing, and dehydrating the gas prior to its entry into the interstate pipeline. The *Rogers* court did not hinge its decision on a finding that "at the well" language was ambiguous. Instead, the court found such language to be completely silent with respect to allocation of costs. In other words, said the court, the language "does not indicate whether the calculation of market value at the well includes or excludes costs, and does not describe how those costs should be allocated, if at all, between the parties." 29 P.3d at 897. Because it deemed the lease language silent, the court found that the lessees' implied covenant to market the gas governs the allocation of costs. The court explained that under the implied covenant to market the gas, the lessee alone must bear the costs to make the gas marketable when the gas is not marketable at the physical location of the well. The Colorado court recognized that it may be in the minority of states on this issue, citing contrary authority from Oklahoma, Texas, and Michigan, but noted that these courts generally do not recognize the lessor's implied covenant to market the gas.[4]

 This Court finds it unnecessary to adopt wholesale the reasoning of either of the courts above in answering the question before us. Instead, we simply look to our own settled law. We begin our analysis with the recognition that traditionally in this State the landowner has received a royalty based on the sale price of the gas received by the lessee. In Robert Donley, *The Law of Coal, Oil and Gas in West Virginia and Virginia* § 104 (1951), it is stated:

> From the very beginning of the oil and gas industry it has been the practice to compensate the landowner by selling the oil by running it to a common carrier and paying to him [the landowner] one-eighth of the sale price received. This practice

has, in recent years, been extended to situations where gas is found[.]

"The one-eighth received is commonly referred to as the landowner's royalty." *Wellman v. Energy Resources, Inc.*, 210 W.Va. 200, 209, 557 S.E.2d 254, 263 (2001). In *Wellman*, we expressly recognized the general duty of a lessee to market the oil or gas produced. We explained:

> In *Davis v. Hardman*, 148 W.Va. 82, 133 S.E.2d 77 (1963), this Court stated that a distinguishing characteristic of [the landowner's royalty] is that it is not chargeable with any of the costs of discovery and production. The Court believes that such a view has been widely adopted in the United States.
>
> In spite of this, there has been an attempt on the part of oil and gas producers in recent years to charge the landowner with a *pro rata* share of various expenses connected with the operation of an oil and gas lease such as the expense of transporting oil and gas to a point of sale, and the expense of treating or altering the oil and gas so as to put it in a marketable condition. To escape the rule that the lessee must pay the costs of discovery and production, these expenses have been referred to as "post-production expenses." . . .
>
> The rationale for holding that a lessee may not charge a lessor for "post-production" expenses appears to be most often predicated on the idea that the lessee not only has a right under an oil and gas lease to produce oil or gas, but he also has a duty, either express, or under an implied covenant, to market the oil or gas produced. The rationale proceeds to hold the duty to market embraces the responsibility to get the oil or gas in marketable condition and actually transport it to market.

*Wellman*, 210 W.Va. at 209–210, 557 S.E.2d at 263–264. This Court held in Syllabus Points 4 and 5 of *Wellman*,

4. Three articles which are instructive on this issue are Randy Sutton, J.D., *Sufficiency of "At the Well" Language in Oil and Gas Leases to Allocate Costs,* 99 A.L.R.5th 415 (2002); Jefferson D. Stewart and David F. Maron, *Post–Production Charges To Royalty Interests: What Does The Contract Say And When Is It Ignored?* 70 Miss. L.J. 625 (2000); and Owen L. Anderson, *Royalty Valuation: Should Royalty Obligations Be Determined Intrinsically, Theoretically, or Realistically?* (Part I) 37 Nat. Resources J. 547 (1997).

4. If an oil and gas lease provides for a royalty based on proceeds received by the lessee, unless the lease provides otherwise, the lessee must bear all costs incurred in exploring for, producing, marketing, and transporting the product to the point of sale.

5. If an oil and gas lease provides that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale, the lessee shall be entitled to credit for those costs to the extent that they were actually incurred and they were reasonable. Before being entitled to such credit, however, the lessee must prove, by evidence of the type normally developed in legal proceedings requiring an accounting, that he, the lessee, actually incurred such costs and that they were reasonable.

Accordingly, the present dispute boils down to whether the "at the wellhead"-type language at issue is sufficient to alter our generally recognized rule that the lessee must bear all costs of marketing and transporting the product to the point of sale. We conclude that it is not.

As noted by CNR, "[a] valid written instrument which expresses the intent of the parties in plain and unambiguous language is not subject to judicial construction or interpretation but will be applied and enforced according to such intent." Syllabus Point 1, *Cotiga Development Co. v. United Fuel Gas Co.*, 147 W.Va. 484, 128 S.E.2d 626 (1962). However, when a contract is ambiguous, it is subject to construction. This Court has said that "[t]he term 'ambiguity' is defined as language 'reasonably susceptible of two different meanings' or language 'of such doubtful meaning that reasonable minds might be uncertain or disagree as to its meaning.'" *Payne v. Weston*, 195 W.Va. 502, 507, 466 S.E.2d 161, 166 (1995), *quoting* Syllabus Point 1, in part, *Shamblin v. Nationwide Mut. Ins. Co.*, 175 W.Va. 337, 332 S.E.2d 639 (1985). We have also explained that "[a] contract is ambiguous when it is reasonably susceptible to more than one meaning in light of the surrounding circumstances and after applying the established rules of construction." *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 65 n. 23, 459 S.E.2d 329, 342 n. 23 (1995). Finally, "[t]he question as to whether a contract is ambiguous is a question of law to be determined by the court." Syllabus Point 1, in part, *Berkeley County Pub. Serv. Dist. v. Vitro Corp. of Am.*, 152 W.Va. 252, 162 S.E.2d 189 (1968).

We believe that the "wellhead"-type language at issue is ambiguous. First, the language lacks definiteness. In other words, it is imprecise. While the language arguably indicates that the royalty is to be calculated at the well or the gas is to be valued at the well, the language does not indicate *how* or *by what method* the royalty is to be calculated or the gas is to be valued. For example, notably absent are any specific provisions pertaining to the marketing, transportation, or processing of the gas. In addition, in light of our traditional rule that lessors are to receive a royalty of the sale price of gas, the general language at issue simply is inadequate to indicate an intent by the parties to agree to a contrary rule—that the lessors are not to receive 1/8 of the sale price but rather 1/8 of the sale price less a proportionate share of deductions for transporting and processing the gas. Also of significance is the fact that although some of the leases below were executed several decades ago, apparently CNR did not begin deducting post-production costs from the lessors' royalty payments until about 1993. Under these circumstances, we are unable to conclude that the lease language at issue was originally intended by the parties, at the time of execution, to allocate post-production costs between the lessor and the lessee.

CNR asserts, however, that when read with accompanying language such as "gross proceeds," "market price," and "net of all costs," the wellhead-type language clearly calls for allocation of post-production expenses. We disagree. First, we note that the word "gross" implies, contrary to CNR's interpretation, that there will be no deductions taken. Hence, the phrase "gross proceeds at the wellhead" could be construed to mean the gross price for the gas received by the lessee. On the other hand, the words "gross proceeds" when coupled with the phrase "at the wellhead" could be read to create an inherent conflict due to the fact

that the lessees generally do not receive proceeds for the gas at the wellhead. Such an internal conflict results in an ambiguity. Likewise, the phrase "market price at the wellhead" is unclear since it contemplates the actual sale of gas at the physical location of the wellhead, although the gas generally is not sold at the wellhead. In addition, we believe that the phrase "net of all costs beyond the wellhead" could be interpreted to mean free of all costs or clear of all costs beyond the wellhead which is directly contrary to the interpretation urged by CNR. Finally, CNR also claims that the phrase "less all taxes, assessments, and adjustments" clearly indicates that post-production expenses can be deducted from the lessors' royalties. Again, we disagree. Absent additional language that clarifies what the parties intended by the words "assessments" and "adjustments," we believe these words to be ambiguous on the issue of the allocation of post-production expenses.

■ CNR also cites for support this Court's statement in *Wellman* that,

the language of the leases in the present case indicating that the "proceeds" shall be from the "sale of gas as such at the mouth of the well where gas ... is found" might be language indicating that the parties intended that the Wellmans, as lessors, would bear part of the costs of transporting the gas from the wellhead to the point of sale[.]

210 W.Va. at 211, 557 S.E.2d at 265. According to CNR, this language was included in the opinion for the purpose of giving meaning to our holding in Syllabus Point 5 of *Wellman* where we stated that the allocation of post-production expenses will be permitted where expressly provided for in a lease. We find CNR's reliance on the above language to be misplaced. This Court has held that "when new points of law are announced ... those points will be articulated through syllabus points as required by our state constitution." Syllabus Point 2, in part, *Walker v. Doe*, 210 W.Va. 490, 558 S.E.2d 290 (2001). The comments relied upon by CNR are dicta insofar as they are not necessary to our decision in *Wellman*. The fact is that we simply did not decide in *Wellman* whether

"at the wellhead"-type language is or is not ambiguous. Therefore, we find no merit to CNR's reliance on our language in *Wellman*.

CNR further cites for support *Cotiga Development Company v. United Fuel Gas Company*, 147 W.Va. 484, 128 S.E.2d 626 (1962), wherein this Court distinguished the wellhead or field price of gas from the price received by the lessee when the gas is marketed. However, while we did distinguish between the wellhead price and the actual selling price of gas, we did not define wellhead price, determine how it is calculated, or decide the specific question currently before us. Therefore, we find our discussion in *Cotiga* unhelpful in deciding the present issue. Accordingly, in light of the above, we conclude that the "at the wellhead" type language at issue is ambiguous because it is susceptible to more than one construction and reasonable people can differ as to its meaning.

■ Having found the language at issue ambiguous, the lessors urge that the language should be construed against CNR consistent with "[t]he general rule as to oil and gas leases ... that such contracts will generally be liberally construed in favor of the lessor, and strictly as against the lessee." Syllabus Point 1, *Martin v. Consolidated Coal & Oil Corp.*, 101 W.Va. 721, 133 S.E. 626 (1926). CNR posits, to the contrary, that the lease language at issue should not be construed against it. According to CNR, many of the lessors are business entities which are as sophisticated in commercial matters as CNR. Further, says CNR, many of the lessors consulted with attorneys experienced in oil and gas law and even amended the leases prior to signing them.

■ We choose to adhere to our traditional rule and construe the language against the lessee. Significantly, CNR drafted the "the wellhead"-type language in dispute. Under our law, "[u]ncertainties in an intricate and involved contract should be resolved against the party who prepared it." Syllabus Point 1, *Charlton v. Chevrolet Motor Co.*, 115 W.Va. 25, 174 S.E. 570 (1934). Simply put, if the drafter of the leases below originally intended the lessors to bear a portion of the

transportation and processing costs of oil and gas, he or she could have written into the leases specific language which clearly informed the lessors exactly how their royalties were to be calculated and what deductions were to be taken from the royalty amounts for post-production expenses.

██ It is also CNR's position that having found the disputed lease language herein ambiguous, the rules of interpretation require that the intent of the parties now be determined by the finder of fact. This is incorrect. Under our law, " '[i]t is the province of the court, and not of the jury, to interpret a written contract.' *Franklin v. Lilly Lumber Co.*, 66 W.Va. 164, 66 S.E. 225 [1909]." Syllabus Point 1, *Stephens v. Bartlett*, 118 W.Va. 421, 191 S.E. 550 (1937). There are exceptions to this rule but none are applicable here.[5] Thus, we reject CNR's argument.[6]

██ Accordingly, this Court now holds that language in an oil and gas lease that is intended to allocate between the lessor and lessee the costs of marketing the product and transporting it to the point of sale must expressly provide that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale, identify with particularity the specific deductions the lessee intends to take from the lessor's royalty (usually 1/8), and indicate the method of calculating the amount to be deducted from the royalty for such post-production costs. We further hold that language in an oil and gas lease that provides that the lessor's 1/8 royalty (as in this case) is to be calculated "at the well," "at the wellhead," or similar language, or that the royalty is "an amount equal to 1/8 of the price, net all costs beyond the wellhead," or

"less all taxes, assessments, and adjustments" is ambiguous and, accordingly, is not effective to permit the lessee to deduct from the lessor's 1/8 royalty any portion of the costs incurred between the wellhead and the point of sale.

## IV.

## CONCLUSION

For the reasons set forth above, we answer the reformulated certified question as follows:

In light of the fact that West Virginia recognizes that a lessee to an oil and gas lease must bear all costs incurred in marketing and transporting the product to the point of sale unless the oil and gas lease provides otherwise, is lease language that provides that the lessor's 1/8 royalty is to be calculated "at the well," "at the wellhead" or similar language, or that the royalty is an amount equal to 1/8 of the price, net all costs beyond the "wellhead," or "less all taxes, assessments, and adjustments" sufficient to indicate that the lessee may deduct post-production expenses from the lessor's 1/8 royalty, presuming that such expenses are reasonable and actually incurred?

Answer: No.

Certified question answered

<hr/>

5. In Syllabus Point 4 of *Watson v. Buckhannon River Coal Co.*, 95 W.Va. 164, 120 S.E. 390 (1923), this Court held,

While the general rule is that the construction of a writing is for the court, yet where the meaning is uncertain and ambiguous, parol evidence is admissible to show the situation of the parties, the surrounding circumstances when the writing was made, and the practical construction given to the contract by the parties themselves either contemporaneously or subsequently. If the parol evidence be not in conflict, the court must construe the writing; but, if it be conflicting on a material point necessary to interpretation of the writing, then

the question of its meaning should be left to the jury under proper hypothetical instructions.

6. CNR also asserts that the leases' so-called "marketing clause" which provides that "the time and method of marketing ... shall be within the sole discretion of the lessee," when read with the "at the wellhead" language, unquestionably indicates that CNR is entitled to deduct post-production expenses from the lessors' royalty. We disagree and fail to see how the marketing clause language sheds any light on the issue herein.