No. 23-589, *Jacklin Romeo, Susan S. Rine, and Debra Snyder Miller v. Antero Resources Corporation*

**FILED**

**November 14, 2024**

released at 3:00 p.m.

C. CASEY FORBES, CLERK

SUPREME COURT OF APPEALS

OF WEST VIRGINIA

BUNN, Justice, dissenting:

I disagree with the majority's opinion in this case. While I do not seek to wholly abandon more than two decades of precedent set forth in *Wellman v. Energy Resources, Inc.*, 210 W. Va. 200, 557 S.E.2d 254 (2001), and expanded in *Estate of Tawney v. Columbia Natural Resources*, 219 W. Va. 266, 633 S.E.2d 22 (2006),[1] I instead would have decided this case narrowly, based upon the reasoning justifying those cases' outcomes at the time they were decided and in consideration and context of the facts giving rise to those decisions, rather than reading their syllabus points standing alone, as the majority appears to do. *See State v. McKinley*, 234 W. Va. 143, 149, 764 S.E.2d 303, 309 (2014) (acknowledging that an opinion's "syllabus is not intended to be an exhaustive recitation of every item decided in the case, and must be read in light of the opinion as a whole"); *see also Romeo v. Antero Res. Corp.*, ___ W. Va. ___, ___, ___ S.E.2d ___, ___ (2024) (Walker, J., dissenting) (also quoting *McKinley*). In answering the certified questions from the United States District Court for the Northern District of West Virginia, I would have

---

[1] I agree with much of Justice Walker's well-reasoned dissent in this case where she advocates for overruling our holdings in *Wellman v. Energy Resources, Inc.*, 210 W. Va. 200, 557 S.E.2d 254 (2001), and *Estate of Tawney v. Columbia Natural Resources*, 219 W. Va. 266, 633 S.E.2d 22 (2006). *See Romeo v. Antero Res. Corp.*, ___ W. Va. ___, ___, ___ S.E.2d ___, ___ (2024) (Walker, J., dissenting). However, rather than fully overruling those cases, as I explain here, I would interpret them based upon their historical underpinnings and applicable facts.

1

interpreted *Wellman*, and particularly its point of sale language in Syllabus point 4,[2] to mean that oil and gas producers must bear post-production costs only until the oil or gas reaches the first available point of sale where it *can* be sold—not to the location where the oil or gas (or byproducts) are *actually* sold. I further would rein in *Tawney's* overreach, set forth in its Syllabus point 10,[3] that refuses to allow parties to actually contract regarding what, if any, post-production costs may be charged to the royalty owner under an oil and gas lease without including in those leases particular mandatory provisions identified by the *Tawney* Court. The majority's application of *Tawney*, and rejection of generally accepted principles of contract law, is particularly troubling here, as the leases at issue do not appear to reflect that the parties contemplated any express or implied duty to market natural gas liquids ("NGLs") when they entered the leases. Instead, I would refuse to apply *Tawney* to NGLs and further would limit *Tawney's* application to the type of products

---

[2] "If an oil and gas lease provides for a royalty based on proceeds received by the lessee, unless the lease provides otherwise, the lessee must bear all costs incurred in exploring for, producing, marketing, and transporting the product to the point of sale." Syl. pt. 4, *Wellman*, 210 W. Va. 200, 557 S.E.2d 254.

[3] *Tawney* provides, in Syllabus point 10:

> Language in an oil and gas lease that is intended to allocate between the lessor and lessee the costs of marketing the product and transporting it to the point of sale must expressly provide that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale, identify with particularity the specific deductions the lessee intends to take from the lessor's royalty (usually 1/8), and indicate the method of calculating the amount to be deducted from the royalty for such post-production costs.

219 W. Va. 266, 633 S.E.2d 22.

2

considered by that Court. Ultimately, I would not leave West Virginia as an admitted minority of one, where oil and gas producers pay all post-production costs to the actual point that the oil or gas —or byproducts—are actually sold. Maj. op. at 13 (acknowledging "our 'point of sale' rule may make West Virginia a minority of one"). The majority's opinion extends *Tawney's* "gap filler" provisions, purportedly related to the implied covenant to market, to such an extent that the right to freely contract is not only inhibited, but fully incapacitated by the requirement that the contracting parties must use magic words and clairvoyance to memorialize their arms-length transactions. *See SWN Prod. Co., LLC v. Kellam*, 247 W. Va. 78, 98, 875 S.E.2d 216, 236 (2022) (Walker, J., dissenting).

### A.     "Marketable" Does Not Mean Sold

Throughout our oil and gas jurisprudence, the Court has discussed the origins of oil and gas producers' duty to market—what it means, how it arose, how it is interpreted, and how it can be express or implied. But an examination of the underpinnings of our case law reveals the Court's repeated emphasis on the role of the producer in getting a product to a *marketable* condition and to *a* point of sale—not, necessarily, sold. The majority wrongly rejects this conclusion by determining that a producer complies with its duty to market only by completing the sale of the product (and, in turn, bears post-production costs to that point).

While the majority interprets *Wellman*, particularly Syllabus point 4, to provide that post-production expenses must be borne by the producer until the product is

3

actually sold, the discussion of "point of sale" and "marketable" in *Wellman* and its progeny contradicts that interpretation, instead indicating that when the Court originally considered the issues in *Wellman*, the duty to market was only to make a product marketable, not sold. Certainly, the *Wellman* Court ultimately concluded that "[i]f an oil and gas lease provides for a royalty based on proceeds received by the lessee, unless the lease provides otherwise, the lessee must bear all costs incurred in exploring for, producing, marketing, and transporting the product to the point of sale." Syl. pt. 4, *Wellman*, 210 W. Va. 200, 557 S.E.2d 254. Yet, in reaching this holding, as the *Wellman* Court discussed a producer's duty to market oil and gas for the royalty owner before it announced Syllabus point 4, the Court recognized that producers sought to charge royalty owners with expenses to both transport oil and gas "to *a* point of sale" and to treat the oil and gas "to put it in a marketable condition," calling these costs collectively "post-production expenses."[4] *Id.* at 210, 557 S.E.2d at 264 (emphasis added). In determining what, if any, of these costs must be paid by the producer alone, the Court recognized the duty to market, which could be express (in

---

[4] The *Wellman* Court noted that

> there has been an attempt on the part of oil and gas producers in recent years to charge the mineral owner with a *pro rata* share of various expenses connected with the operation of an oil and gas lease such as the expense of transporting oil and gas to a point of sale, and the expense of treating or altering the oil and gas so as to put it in a marketable condition. To escape the rule that the lessee must pay the costs of discovery and production, these expenses have been referred to as "post-production expenses."

210 W. Va. at 210, 557 S.E.2d at 264.

4

the lease) or implied, with the rationale being that "the duty to market embraces the responsibility to get the oil or gas in *marketable* condition and actually transport it to market." *Id.* (emphasis added). Then, when considering that rationale, the *Wellman* Court explained that, in West Virginia, "a lessee impliedly covenants that he *will market* oil or gas produced."[5] *Id.* at 211, 557 S.E.2d at 265 (emphasis added) (citing Robert Tucker Donley, *The Law of Coal, Oil and Gas in West Virginia and Virginia* §§ 70 & 104 (1951)). The language used in *Wellman* complies with the plain language definition of the term marketable, which Merriam-Webster's Dictionary defines, as its first meaning, as "fit to be offered for sale in a market." Merriam-Webster Online, https://www.merriam-webster.com/dictionary/marketable (last visited Nov. 13, 2024). When reading the *Wellman* decision as a whole, not just as a stand-alone syllabus point, the Court plainly meant that producers must bear post-production expenses, under the express or implied duty to market, until the product is marketable—not until the product is actually sold.

In *Tawney*, the Court reiterated *Wellman's* reasoning, quoting the language from *Wellman* that the "rationale" regarding the express or implied duty to market

---

[5] In reaching this conclusion, the *Wellman* Court cited with approval courts from Kansas, Colorado, and Oklahoma, which the *Wellman* Court interpreted to, like West Virginia, hold that "a lessee impliedly covenants that he will market oil or gas produced." *Wellman*, 210 W. Va. at 211, 557 S.E.2d at 265. Courts in Kansas, Colorado, and Oklahoma have expanded the producer's "implied duty to market" gas by creating a "first marketable product" doctrine. Patricia Proctor et. al., *Moving Through the Rocky Legal Terrain to Find A "Safe" Royalty Clause or A "New" Market at the Well*, 19 Tex. Wesleyan L. Rev. 145, 149 (Fall 2012). Instead of following this trend, the majority now rejects any reliance on those states' authority to assist us with the question before the Court now. Maj. op. at 16.

"'embraces the responsibility to get the oil or gas in *marketable* condition and actually transport it to market,'"—which does not include any requirement that the products must be transported to the point where a sale is completed. *See Tawney*, 219 W. Va. at 271, 633 S.E.2d at 27 (emphasis added) (quoting *Wellman*, 210 W. Va. at 210, 557 S.E.2d at 264).

Furthermore, the Court—recently—interpreted *Wellman's* syllabus points to mean that West Virginia is "firmly cemented . . . as a '*marketable* product rule' state, meaning that the lessee bears all post-production costs incurred until the product is *first rendered marketable*, unless otherwise indicated in the subject lease." *Kellam*, 247 W. Va. at 83, 875 S.E.2d at 221 (emphasis added). As the Supreme Court of Colorado explained, this "first-marketable product rule" provides "that the point where a marketable product is first obtained is the logical point where the exploration and production segment of the oil and gas industry ends, is the point where the primary objective of the lease contract is achieved, and therefore is the logical point for the calculation of royalty." *Rogers v. Westerman Farm Co.*, 29 P.3d 887, 904 (Colo. 2001), *as modified on denial of reh'g* (Aug. 27, 2001) (quotation marks and citation omitted).

Even considering the Court's prior recognition that post-productions costs are attributable to the producer only until the product is first rendered *marketable* in *Wellman*, *Tawney*, and *Kellam*, and that the product must be transported *to* market, not necessarily a final place of sale, the majority continues to interpret the term "the point of sale" quite literally, with a strict construction to mean the very end point of sale, *instead* of when the

6

product is first *able* to be sold. Even in its discussion of the words "marketing" and "marketable," the majority appears to purposefully obfuscate the Court's original discussion in *Wellman*, which was quoted in *Tawney*, and later explained in *Kellam.* The majority twists the meaning of the word marketable to mean actually sold.[6] This construction can lead to potentially ludicrous consequences; as the majority's author suggested through an erudite question at oral argument, the majority's decision could result in the producer bearing all costs for converting products from a well into something entirely different such as plastics, while still having to pay royalty holders a percentage of the sale price, all without that situation being contemplated or bargained for in the lease. In other words, under the majority's approach, where is the logical end for a producer's duty to bear all the costs—or is there one?

Yet, the majority's reasoning in answering the first certified question appears to be "because we've always done it that way," as the majority interprets the Court's prior case law to mean that that producers must pay post-production costs until the actual sale of

---

[6] The Court's lack of flexibility in *this* case regarding the meaning of "point of sale" is, practically, converse to the Court's construction of these syllabus points in another oil and case decision made this term, *Kaess v. BB Land, LLC*, No. 23-522, ___ W. Va. ___, ___ S.E.2d ___ (2024). In *Kaess*, the Court interpreted the wording of *Wellman's* syllabus points in a loosey-goosey fashion, stretching the meaning of the syllabus points specifically addressing leases with proceeds royalty provisions to extend to leases that are in-kind leases. *See generally* ___ W. Va. ___, ___ S.E.2d. ___. As Justice Walker aptly noted in her dissent, which I joined, the majority of the Court in *Kaess* "muddl[ed] the distinction between different types of leases," ultimately "lo[sing] sight of the fact that the language of the in-kind royalty lease controls." *Id.* at ___, ___, ___ S.E.2d. at ___, ___ (Walker, J. dissenting).

7

the oil, gas, or byproducts, rather than at the first available point of sale, contending that history mandates this interpretation and ultimate result. Maj. op. at 14. This approach rejects a good faith examination of what "point of sale" should and does mean in the broader context of our jurisprudence, is short sighted, and is, in my estimation, results-oriented rather than "legally sound." *See State v. Sutherland*, 231 W. Va. 410, 417, 745 S.E.2d 448, 456 (2013) (acknowledging that "we will part ways with precedent that is not legally sound"). For these reasons, I dissent from the majority's conclusion that producers must pay post-production costs until the oil or gas, or byproducts, are *actually* sold, rather than at the first point the oil or gas is able to be sold.

### B.     Tawney Should Not Apply to NGLs

Turning to the majority's resolution as to the second certified question relating to producers' obligation to pay post-production costs for NGLs until the NGLs are sold, the majority's conclusion of this issue is equally misguided. Because the bedrock principles of the freedom to contract are judicially limited by *Tawney*, *Tawney* should be construed narrowly and only applied where necessary; its application is particularly problematic when applied to NGLs given the leases at issue here.

First, *Tawney's* specific requirements regarding what detailed language must be in a lease before a royalty owner may bear any post-production costs rejects traditional principles of contract law. As the Court recognized long ago, "[i]mplied covenants . . . are only justified on grounds of legal necessity, and to effectuate the purposes of the contract."

8

*Allen v. Colonial Oil Co.*, 92 W. Va. 689, 695, 115 S.E. 842, 844 (1923). However, *Tawney's* requirements permit courts to "supersede the express terms with an implied covenant." *Kellam*, 247 W. Va. at 98, 875 S.E.2d at 236 (Walker, J., dissenting). The *Tawney* Court creates unnecessary roadblocks to the parties' freedom to contract when it defines, in a Syllabus point, the particular language to include in a lease for post-production costs to be shared. Instead of allowing the parties to contract at will, *Tawney's* Syllabus point 10 provides an almost impossible path for parties seeking to agree that royalty owners will pay *any* post-production expenses, as the lease "must expressly provide that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale, identify *with particularity* the specific deductions the lessee intends to take from the lessor's royalty (usually 1/8), and indicate the method of calculating the amount to be deducted from the royalty for such post-production costs." Syl. pt. 10, in part, *Tawney*, 219 W. Va. 266, 633 S.E.2d 22 (emphasis added).

Still, the *Tawney* opinion gives no indication that the Court then contemplated any post-production costs outside of the transportation and processing costs of oil and gas; particularly, it gives no indication that its syllabus point would also apply to NGLs, or, specifically "the costs incurred in processing, fractionating, and transporting residue gas and natural gas liquids to the point of sale,"[7] at the time the Court issued *Tawney*. Nor does it appear, on the face of the leases at issue here, that the parties to the

---

[7] Maj. op. at 23; Syl. pt. 9, in part, *id.*

9

leases contemplated NGLs at the time the leases were executed. In concluding that these post-production costs for NGLs must be borne entirely by the producers, the majority seems to base its reasoning on the simple idea of basic contract principles, finding the leases are ambiguous and therefore applying *Tawney*. The majority states that

> the dispositive question before us is whether the petitioners' leases contain clear, unambiguous language indicating the parties' agreement that royalties will be paid on the net sale price of residue gas and/or NGLs , i.e., the mineral owners' proportionate share of the sale price less their proportionate share of the costs incurred by the producer after the point at which the wet gas was rendered marketable.

Maj. op. at 20.

For both leases considered in the certified questions, the majority concludes that the leases are ambiguous as "to whether, when, and how royalties are payable to the lessor, and completely silent with respect to whether, when, and how postproduction costs may be deducted from the royalties." Maj. op. at 22 (repeating this language with respect to both leases). Ultimately, the majority expands *Tawney* and holds that

> absent express language in a gas lease sufficient to satisfy the requirements set forth in syllabus point ten of *Estate of Tawney v. Columbia Natural Resources*, *L.L.C.*, 219 W. Va. 266, 633 S.E.2d 22 (2006), a producer/lessee may not deduct from a mineral owner/lessor's royalties a proportionate share of the costs incurred in processing, fractionating, and transporting residue gas and natural gas liquids to the point of sale.

Maj. op. at 23; Syl. pt. 9, *id.* I disagree with this conclusion. I would have decided this case by limiting *Tawney's* application of lease language requirements only to the types of

products discussed in the *Tawney* opinion, and not expanded its application to novel issues relating to excess post-production costs to an *already* marketable product to yield refined products like NGLs.[8] *See, e.g.*, *Mittelstaedt v. Santa Fe Mins., Inc.*, 954 P.2d 1203, 1209 (Okla. 1998) ("We conclude that dehydration costs necessary to make a product marketable, or dehydration within the custom and usage of the lessee's duty to create a marketable product, without provision for cost to lessors in the lease, are expenses not paid from the royalty interest. However, *excess* dehydration to an already marketable product is to be allocated proportionately to the royalty interest when such costs are reasonable, and when actual royalty revenues are increased in proportion to the costs assessed against the royalty interest. It is the lessee's burden to show that the excess dehydration costs charged against the royalty interest occurred to a marketable product, i.e., that the cost is a post-production cost.").

In summary, to the extent that the majority contends that its conclusions are merely a simple, logical application of *Wellman* and *Tawney*, I disagree. Rather, the majority's answers to the Northern District's certified questions stretch the principles

---

[8] Furthermore, the majority's reliance on *Corder v. Antero Resources Corp.*, 57 F.4th 384 (4th Cir. 2023), to justify its outcome in the case is the epitome of circular reasoning. The majority states that the Fourth Circuit Court of Appeals rejected Antero's "first point of marketability approach" there. Maj. op. at 12 n.11. Yet—as the majority recognizes—in analyzing whether *Tawney* applied to the leases at issue in that case, the Fourth Circuit concluded that "Because the West Virginia Supreme Court [of Appeals] has not adopted a contrary rule, we conclude that the *Tawney* requirements apply through the point of sale." *Corder*, 57 F.4th at 397; Maj. op. at 12 n.11. The majority's analysis amounts to, in simple terms, "this is what the Fourth Circuit said we *might* do, so we better do it."

established in these cases well beyond the syllabus points' original contemplation. Accordingly, I respectfully dissent.