NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0383n.06
Filed: June 11, 2007

No. 06-3906

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| Central West Virginia Energy Company, | ) | |
| | ) | ON APPEAL FROM THE |
| Appellant, | ) | UNITED STATES DISTRICT |
| | ) | C O U R T   F O R   T H E |
| v. | ) | NORTHERN DISTRICT OF |
| | ) | OHIO |
| Wheeling-Pittsburgh Steel Corporation, | ) | |
| | ) | **O P I N I O N** |
| Appellee. | ) | |

BEFORE:     COOK and McKEAGUE, Circuit Judges; and EDGAR, District Judge.[*]

**McKeague, Circuit Judge.** Appellant Central West Virginia Energy Company appeals the

decision affirming the orders of the bankruptcy court that permitted assignments of rights under a

coal supply agreement and enjoined Appellant from reducing the amount of coal it supplied under

the agreement. For the reasons stated below, we AFFIRM the decision of the district court.

## I. BACKGROUND

Wheeling-Pittsburgh Steel Corporation ("Wheeling-Pitt") owns and operates the Follansbee

Coke Plant in Follansbee, West Virginia (the "Coke Plant") where several types of metallurgical coal

are used as raw materials in the production of coke, which in turn is used in the production of steel.

---

[*] The Honorable Robert Allan Edgar, Senior Judge, United States District Court for the
Eastern District of Tennessee, sitting by designation.

Wheeling-Pitt also owns and operates a steel manufacturing plant in Steubenville, Ohio (the "Steel Plant"). The Coke Plant produces coke to be used to make steel at the Steel Plant. Central West Virginia Energy Company ("CWVEC") and Wheeling-Pitt are parties to a Coal Supply Agreement dated November 15, 1993 (the "CSA"). Under the CSA, which had an original term of ten years, Wheeling-Pitt was to obtain 100% of its high volatile coking coal from CWVEC.

On November 16, 2000, Wheeling-Pitt and several of its affiliates filed voluntary petitions for reorganization under Chapter 11. Just prior to that date, CWVEC had suspended shipments of coal due to Wheeling-Pitt's failure to pay for past shipments. At the time, Wheeling-Pitt owed CWVEC approximately $7.2 million.

On September 13, 2001, after Wheeling-Pitt obtained several extensions of time for filing its bankruptcy reorganization plan, CWVEC filed a motion to compel Wheeling-Pitt to either assume or reject the CSA, which was executory in nature. Wheeling-Pitt had the right under § 365(a) and (d)(2) of the Bankruptcy Code to either assume or reject the CSA as part of the reorganization plan. Since the reorganization plan did not seem to be forthcoming, CWVEC, as it had the right, moved the bankruptcy court to force Wheeling-Pitt to make a decision. CWVEC was unhappy with the arrangement under which it had to supply Wheeling-Pitt with coal at the contract rate, which was significantly less than the then-current market price. The motion was denied on December 6, 2001, because Wheeling-Pitt, as debtor-in-possession, was not yet in a position to know whether the CSA was a benefit to the bankruptcy estate and whether the estate could make a cure payment of over $7 million, which would be required if the CSA were incorporated into the reorganization plan.

On March 30, 2002, CWVEC and Wheeling-Pitt entered into a Letter Agreement

amending the CSA.  A major portion of the dispute in this appeal involves the meaning of Article

XX of the CSA, entitled "Assignability," as amended by the Letter Agreement.  Article XX,

consisting of two paragraphs, states in relevant part:

> . . . this Agreement may not be assigned by either party, except as indicated below, without the prior written consent of the other, except that either party may without the written consent of the other assign or pledge for financing purposes this Agreement or any monies due or to become due hereunder. . . . Customer [Wheeling-Pitt] may also without the consent of the Seller [CWVEC] assign this Agreement (in whole or in part) to any of its wholly owned subsidiaries to which it has conveyed the Plant or its operations, provided that any assignment of this Agreement shall not relieve Customer from its obligations hereunder.  Customer shall not sell, lease, transfer or convey all or any substantial portion of the Plant, or license out its operation, to any person or entity unless such person or entity assumes the obligations of the Customer hereunder.  Any such assignment of this Agreement shall not relieve Customer from its obligations hereunder.
>
> In the event of any such sale, lease, transfer, conveyance or licensing to any person or entity other than a wholly-owned subsidiary of customer, Seller shall have the right, at its option, to terminate this Agreement.

J.A. at 100-01, 227.  The Letter Agreement, dated March 30, 2002, states in relevant part:

> <u>Contract Assignment</u>: Wheeling-Pitt may assign this Agreement to any corporation, partnership or other entity or person provided that such assignee assumes all of Wheeling-Pitt's obligations under the Agreement, as amended herein.  If such assignment is made during the pendency of the current bankruptcy case, such assignment is subject to the approval by the Bankruptcy Court, and may be opposed by CWVEC if CWVEC believes that the assignee does not provide assurance of performance that is equal to, or superior to, the assurance provided by Wheeling-Pitt. If such assignment occurs when the Chapter 11 case is no longer pending, then such assignment shall be subject to approval by CWVEC's credit committee, which approval shall not be unreasonably withheld.  Any such assignment shall be set forth in a formal letter agreement executed by CWVEC, Wheeling-Pitt, and such assignee.

J.A. at 109-10, 227.

On May 2, 2002, the bankruptcy court issued an order approving Wheeling-Pitt's assumption of the CSA, as amended by the Letter Agreement. On December 28, 2004, Wheeling-Pitt announced that it had entered into a non-binding letter of intent to enter into a joint venture (the "Joint Venture") with flat rolled sheet steel producer Severstal North America, Incorporated ("Severstal"). Under the agreement, Severstal would contribute $140 million over four years to rebuild the Coke Plant and would pay Wheeling-Pitt $20 million; in return, Severstal would own 50% of the Coke Plant (which Wheeling-Pitt would continue to operate) and would be entitled to 50% of the coke produced at the Coke Plant. The CSA, as amended, would be assigned to the Joint Venture, making both Severstal and Wheeling-Pitt liable to CWVEC for all obligations under the CSA. CWVEC opposed this assignment.

On February 10, 2005, Wheeling-Pitt moved for bankruptcy court approval of this proposed Joint Venture and for leave to assign the CSA to the Joint Venture. It also filed an adversary proceeding (the "Adversary Proceeding") in bankruptcy court against CWVEC, seeking a declaration of the parties' respective rights. Wheeling-Pitt's complaint for declaratory judgment set out what Wheeling-Pitt believed to be the controversy between it and CWVEC, the background of that controversy, and the requested relief. Relevant portions of the declaratory judgment complaint include:

> 6. For a number of years [Wheeling-Pitt] has owned and operated coke-making facilities that are located in Follansbee, West Virginia. . . .
>
> 7. . . . Section 3 of the Coal Supply Agreement requires CWVEC to deliver coal to [Wheeling-Pitt's] coke-making facilities in Follansbee, West Virginia, which were defined as the "Plant" for purposes of the Coal Supply Agreement.

J.A. at 17.

**The Proposed Assignment**

15. On December 28, 2004, [Wheeling-Pitt] announced it had signed a nonbinding letter of intent to enter a joint venture with flat rolled sheet steel produced Severstal North America Inc. ("Severstal") involving the coke facilities in Follansbee, West Virginia. If consummated, the agreements would require Severstal to contribute $140 million over four years to rebuild the coke-making facilities. Severstal would also pay [Wheeling-Pitt] $20 million when a joint venture deal closes. In return, after making its capital contributions, Severstal would own 50 percent of the joint venture and would be entitled to 50 percent of the coke produced by it. [Wheeling-Pitt] would continue to operate the coke-making facilities for the joint venture.

. . .

17. . . . In addition, the planned repairs to the Plant will not increase the Plant's capacity and therefore will not increase the Plant's coal requirements.

J.A. at 20-21.

**Existence of An Actual Controversy Regarding The Proposed Assignment**

19. [Wheeling-Pitt] has informed CWVEC of the proposed joint venture and of [Wheeling-Pitt's] desire and intention to assign [Wheeling-Pitt's] rights under the Coal Supply Agreement to the joint venture. The assignment of the Coal Supply Agreement is a critical part of the proposed joint venture.

. . .

21. An actual controversy exists between [Wheeling-Pitt] and CWVEC regarding the proposed assignment of [Wheeling-Pitt's] rights under the Coal Supply Agreement in connection with the joint venture described above.

J.A. at 21.

WHEREFORE, [Wheeling-Pitt] hereby requests entry of judgment in its favor:

(1) Declaring that [Wheeling-Pitt] is entitled to assign its rights under the Coal Supply Agreement to any entity that is created to implement the proposed joint

venture with respect to [Wheeling-Pitt's] coke-making facilities in Follansbee, West Virginia;

(2) Declaring that CWVEC may oppose such assignment before this Court if CWVEC believes the assignee does not provide assurance of performance that is equal to, or superior to, the assurance provided by [Wheeling-Pitt], but that CWVEC has no other rights to oppose assignment;

(3) Declaring that such assignment of the Coal Supply Agreement will not affect the continuing validity and enforceability of the Coal Supply Agreement and will not entitle CWVEC to terminate the Coal Supply Agreement or renounce CWVEC's obligations thereunder; . . .

J.A. at 22-23.

In the Adversary Proceeding, CWVEC claimed that the second paragraph of Article XX of the CSA had been unaffected by the Letter Agreement and that the formation of the Joint Venture constituted a "transfer" under that second paragraph. CWVEC contended, therefore, that it had the right to terminate the CSA, and it stated that it wanted to do so. Wheeling-Pitt argued the Letter Agreement's provision for "Contract Assignment" permitted assignment of the CSA, as amended, to the Joint Venture and eliminated CWVEC's option to terminate the CSA.

On May 4, 2005, the bankruptcy court issued a Memorandum Opinion and Order (collectively, the "Declaratory Judgment Order"), ruling that Wheeling-Pitt is entitled to assign its rights under the CSA to a joint venture yet to be formed; that CWVEC may challenge the assignment if it believes the new arrangement would not provide equal or superior performance; and that any approved assignment would not affect the continued validity of the CSA, as amended–that is, the assignment would not constitute grounds for CWVEC to terminate the CSA. In so holding, the bankruptcy court found the "the [CSA], as modified, and the Letter Agreement, are not ambiguous

and do not need parol evidence to be interpreted." J.A. at 232. The bankruptcy court reasoned that the whole of Article XX (prior to amendment) was a restriction on assignment of the CSA, and thus, "when the parties modified the contract assignment rights in the Letter Agreement, the provision regarding termination upon the sale of the Coke Plant was eliminated." J.A. at 233. The bankruptcy court also held that "[b]ecause the Coal Supply Agreement *is a requirements contract for the Coke Plant*, the obligations of CWVEC would not change in the event of a sale or transfer of the Coke Plant." J.A. at 232-33 (emphasis added).

While the bankruptcy court stated that no parol evidence was needed to interpret the meaning of the CSA as amended because its provisions were unambiguous, that court did consider parol evidence in its Declaratory Judgment Order. For example, the bankruptcy court discussed extrinsic evidence in the form of discussions between CWVEC and Wheeling-Pitt when the parties negotiated the Letter Agreement. CWVEC appealed this order.

After the bankruptcy court issued its Declaratory Judgment Order, Wheeling-Pitt filed a complaint in the Circuit Court of Brooke County, West Virginia (the "West Virginia Litigation") alleging breach of contract and seeking damages for CWVEC's continued post-confirmation refusal to deliver coal to Wheeling-Pitt. CWVEC removed the action to the United States District Court for the Northern District of West Virginia. CWVEC answered and counterclaimed for a declaratory judgment concerning how much coal and to whom it must provide under the CSA.

CWVEC's argument concerning requirements was based primarily on language found in Article II, Sections 1 and 3 of the CSA, addressing "Tonnage and Deliveries." Section 1 provides that "the quantity of coal to be sold and purchased during the term of this Agreement is one hundred

percent (100%) of the high volatile coking coal required (the Requirements) for Customer's facilities existing on the date of this Agreement." J.A. at 74. Section 3 provides, "The coal shall be delivered to Customer's Follansbee Coke Plant ("Plant") in Brooke County, West Virginia." J.A. at 75. According to CWVEC, the phrase "facilities existing on the date of the Agreement" refers to both Wheeling-Pitt's Coke Plant *and* Wheeling-Pitt's Steel Plant, not just Wheeling-Pitt's Coke Plant which is defined as "Plant" in Article II, Section 3. Therefore, CWVEC contended that it must supply only the amount of coal required by the Coke Plant to provide coke to Wheeling-Pitt's Steel Plant; it is not required to provide any coal used to produce coke for Severstal. In other words, CWVEC contended that the CSA, even as amended by the Letter Agreement, is a requirements contract for the coal necessary for the Coke Plant to produce coke only for the Steel Plant, not a requirements contract to provide coal for the Coke Plant itself.

Wheeling-Pitt moved the bankruptcy court to enjoin CWVEC from proceeding with its counterclaim in the West Virginia Litigation. Following a hearing on August 16, 2005, the bankruptcy court issued a permanent injunction on September 8, 2005 (the "Injunction Order"), prohibiting CWVEC from proceeding with its counterclaim and further prohibiting CWVEC from reducing the amount of coal it was to supply under the CSA as amended.

While the September 8, 2005 order was very brief, the bankruptcy court gave reasons for its ruling orally following the August 16, 2005 hearing. The court found that it had jurisdiction to issue the injunction pursuant to 11 U.S.C. § 105(a) and the All Writs Act, 28 U.S.C. § 1651. It held that CWVEC's appeal of the May 4, 2005 Declaratory Judgment Order did not divest it of jurisdiction to issue the injunction because the purpose of the injunction was simply to enforce the Declaratory

Judgment Order, and CWVEC's counterclaim was a collateral attack on that order. The court further held that CWVEC's counterclaim was a compulsory counterclaim and thus was a claim that it waived by failing to assert it in the Adversary Proceeding. In so holding, the bankruptcy court emphasized that the declaratory judgment complaint "gives a whole description" of the proposed joint venture and the assignment to that joint venture, and it asks for a declaratory judgment "to assign its rights under the Agreement to any entity that is created to implement the proposed joint venture." J.A. at 668.

The court also noted that it had specifically found in its Declaratory Judgment Order that the CSA was a requirements contract for the Coke Plant itself. The court thus concluded that the issue before the it in the Adversary Proceeding was not limited to CWVEC's termination rights, but the matter also encompassed the requirements issue as well because that issue related to the continuing validity and enforceability of the CSA should it be assigned to the Joint Venture. The bankruptcy court explained that the requirements issue was not specifically addressed in the Adversary Proceeding, however, because, "[t]he requirements issue, as far as this Court was concerned, was not in dispute." J.A. at 669. CWVEC appealed the Injunction Order.

On September 29, 2005, the bankruptcy court issued an order in the bankruptcy proceeding (the "Assignment Order") granting Wheeling-Pitt's motion for an order specifically approving the assignment of the CSA to Mountain State Carbon, LLC, the joint venture formed by Wheeling-Pitt and Severstal. CWVEC appealed the Assignment Order.

All three appeals, the appeal of the Declaratory Judgment Order of May 4, 2005, the Injunction Order of September 8, 2005, and the Assignment Order of September 29, 2005, were

consolidated by the district court for review. The district court issued its final judgment affirming the bankruptcy court on May 24, 2006.

The district court concluded, based on the plain language of Article XX of the CSA and the Letter Agreement, that Wheeling-Pitt may assign the CSA to any person or entity. The amendment also removed CWVEC's termination rights, subjecting any assignment to approval of the bankruptcy court or, if Wheeling-Pitt is no longer in bankruptcy, to approval by CWVEC's designated credit committee. The district court agreed with CWVEC that the bankruptcy court may have improperly considered some parol evidence on this issue but found such consideration to be harmless because (1) the bankruptcy court did so after examining and interpreting the four corners of Article XX and the Letter Agreement and (2) the district court reached the same conclusion based on its own *de novo* review of the language of the documents.

Next, the district court rejected CWVEC's argument that the bankruptcy court lacked jurisdiction when it enjoined CWVEC from pursuing its counterclaim in the West Virginia Litigation on the ground that "CWVEC's counterclaim was essentially asking another court to rule on an issue already resolved by the bankruptcy court" and that the requirements issue was "inherently contained in the claims of the adversary complaint." J.A. at 396. The district court also found the requirements issue was a compulsory counterclaim which should have been brought in the Adversary Proceeding. Yet the district court rejected Wheeling-Pitt's argument that CWVEC had waived the requirements issue by failing to raise it in its appeal of the bankruptcy court's May 4, 2005 Declaratory Judgment Order, stating simply that "[i]t does appear possible that CWVEC was blind-

sided and attempted unsuccessfully to raise its arguments before the bankruptcy court on August 16, but was rebuffed." J.A. at 398.

Reaching the requirements issue, the district court concluded that the CSA, as amended, was ambiguous but that there was sufficient evidence in the record to address the issue. The district court found that "[s]ince parol evidence established that the Follansbee Plant was the only location that had <u>any</u> requirements for the high volatile coking coal, it follows that the Follansbee Plant was the 'facilities' referred to in [Article II, Section 1 of] the [CSA]." J.A. at 400-01. The district court concluded that the bankruptcy court did not err in finding that the CSA, as amended, "was a requirements contract for the Follansbee [Coke] Plant and, by extension, became a requirements contract for the joint venture formed between the Follansbee Plant and Severstal once the assignment of the Agreement to the joint venture was approved by the bankruptcy court." J.A. at 401-02. The district court also affirmed the bankruptcy court's September 29, 2005 Assignment Order. CWVEC timely appealed the district court's decision.

## II.  ANALYSIS

### A.  Standard of Review

This Court will review the bankruptcy court's decision directly, and it will accord no deference to the district court. *In re 5900 Assocs., Inc.*, 468 F.3d 326, 329 (6th Cir. 2006) (citation omitted). The bankruptcy court's findings of fact are reviewed under the clear error standard, and questions of law are reviewed de novo. *Id.* A factual finding is clearly erroneous "when the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Tran v. Gonzales*, 447 F.3d 937, 943 (6th Cir. 2006).

The issuance by the federal court of an injunction pursuant to the All Writs Act is reviewed under the abuse of discretion standard. *United States v. City of Detroit*, 329 F.3d 515, 524 (6th Cir. 2003). This Court finds an abuse of discretion when it is left with a firm and definite conviction that the lower court committed a clear error of judgment. *See Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 293 (6th Cir. 2007).

**B.  CWVEC's Right to Terminate the CSA**

The parties agree that West Virginia law applies to their contractual dispute. Whether the contract is ambiguous is a question of law that is subject to de novo review. *Estate of Tawney v. Columbia Natural Res., LLC*, 633 S.E.2d 22, 28 (W. Va. 2006). "The mere fact that parties do not agree to the construction of a contract does not render it ambiguous." *Flanagan v. Stalnaker*, 607 S.E.2d 765, 769 (W. Va. 2004). Rather, West Virginia law provides that "the term 'ambiguity' is defined as language 'reasonably susceptible of two different meanings' or language 'of such doubtful meaning that reasonable minds might be uncertain or disagree as to its meaning.'" *Id.* (quoting *Payne v. Weston*, 466 S.E.2d 161, 166 (W. Va. 1995)). However, a latent ambiguity "arises when the instrument upon its face appears clear and unambiguous, but there is some collateral matter which makes the meaning uncertain." *Flanagan*, 607 S.E.2d at 769 n.4 (quoting *Collins v. Treat*, 152 S.E. 205, 206 (W. Va. 1930)).

If a contract contains unambiguous language, it must be construed according to the plain and natural meaning of that language. *Bass v. Coltelli-Rose*, 536 S.E.2d 494, 497 (W. Va. 2000); *Fraternal Order of Police, Lodge No. 69 v. City of Fairmont*, 468 S.E.2d 712, 716 (W. Va. 1996). "Extrinsic evidence may be used to aid in the construction of a contract if the matter in controversy

is not clearly expressed in the contract, and in such case the intention of the parties is always important and the court may consider parol evidence." *Supervalu Operations, Inc. v. Center Design, Inc.*, 524 S.E.2d 666, 670 (W. Va. 1999). Parol evidence also may be admitted in resolving latent ambiguities. *Kopf v. Lacey*, 540 S.E.2d 170, 175 (W. Va. 2000). Finally, West Virginia law provides that when parties enter into a contract that modifies an existing contract, the provisions in the original contract that are inconsistent with the modifications will be abrogated and discharged; on the other hand, the terms and conditions of the original contract, so long as they are consistent with the modified contract, "will remain in full force and effect and become incorporated in the modified contract." *Consol. Coal Co. v. Mineral Coal Co.*, 126 S.E.2d 194, 201 (W. Va. 1962).

On appeal, CWVEC claims that although Article XX provides that Wheeling-Pitt cannot transfer the Coke Plant unless the transferee assumes Wheeling-Pitt's obligations under the CSA, the CSA does not prohibit Wheeling-Pitt from assigning the CSA without transferring the Coke Plant. This, according to CWVEC, proves that the assignment of the CSA and a transfer of the Coke Plant are two different things. CWVEC also emphasizes that the Letter Agreement is silent with respect to the transfer provisions. Therefore, according to CWVEC, the CSA's transfer provisions remain unaffected by the Letter Agreement. CWVEC also contends that the bankruptcy court's consideration of parol evidence was not harmless error, because that consideration "was so pervasive that it cannot be deemed harmless."

The bankruptcy court did not err in concluding that CWVEC lacks the right to terminate the CSA upon a transfer of the Coke Plant to the Joint Venture. Indeed, the CSA as modified and the

Letter Agreement are unambiguous, and CWVEC's interpretation of those documents is unreasonable.

Article XX of the CSA, entitled "Assignment," consists of two paragraphs. These paragraphs place a limitation on the assignability of the CSA. The first paragraph of Article XX provides that (1) Wheeling-Pitt may assign the CSA to another entity with CWVEC's prior written consent; (2) Wheeling-Pitt may not assign the CSA without CWVEC's consent unless the assignment is to a wholly-owned subsidiary of Wheeling-Pitt to which Wheeling-Pitt has also conveyed the Coke Plant; and (3) if Wheeling-Pitt sells or transfers the Coke Plant to any entity, Wheeling-Pitt must also assign the CSA to that entity. The second paragraph of Article XX of the CSA provides that in the event of "any such" transfer or conveyance to an entity other than a wholly-owned subsidiary of Wheeling-Pitt, CWVEC shall have the right to terminate the CSA.

Reading the paragraphs together, *Farley v. Farley*, 600 S.E.2d 177, 181 (W. Va. 2004), the "any such" language in the second paragraph clearly refers to the transfer contemplated in the previous paragraph, namely a transfer of the Coke Plant and the assignment of the CSA to the transferee. Thus, to the extent that Wheeling-Pitt's transfer of the Coke Plant required it to assign the contract to the plant's transferee, Article XX permits CWVEC to prevent the assignment of the contract to a transferee of the plant by providing CWVEC the option of terminating the agreement in the case that the transferee/assignee is not a wholly-owned subsidiary of Wheeling-Pitt. Accordingly, the termination right was, in essence, a restriction on Wheeling-Pitt's ability to assign the CSA. In no way did Article XX prohibit a transfer or conveyance of the Coke Plant. As the

district court noted, Article XX must be read as a whole, and the article is one dealing with a limitation on assignment.

The Letter Agreement, in contrast, provided that Wheeling-Pitt may assign the agreement to "any" entity provided that the assignee assumes all of Wheeling-Pitt's obligations therein. Only two exceptions were provided to that provision: (1) if the assignment is made during the pendency of the bankruptcy case, the assignment is subject to the approval of the bankruptcy court and it may be opposed by CWVEC if CWVEC believes that the assignee does not provide assurance of performance at least as adequate Wheeling-Pitt; and (2) if the bankruptcy case is no longer pending, the assignment is subject to the approval of CWVEC's credit committee, and that approval shall not be unreasonably withheld. Thus, the Letter Agreement no longer allowed CWVEC to terminate the agreement as a restriction on assignability. *Expressio unius est exclusio alterius*. *See Savilla v. Speedway Superamerica, LLC*, 639 S.E.2d 850, 854 (W. Va. 2006).

Therefore, because (1) the assignment provision in the CSA provided that CWVEC could terminate the agreement if Wheeling-Pitt transferred the Coke Plant to a non-wholly-owned subsidiary and (2) the assignment provision in Letter Agreement modifying the CSA is inconsistent with that provision in the CSA, the original provision is no longer given effect. *Consol. Coal Co.*, 126 S.E.2d at 201. CWVEC's argument, set forth above, is unreasonable in this context, as it renders illusory the broad assignment rights present in the Letter Agreement. Any consideration of parol evidence by the bankruptcy court was harmless, to the extent that we have reached the same conclusion on de novo review, or invited, as CWVEC will not be heard to complain of the bankruptcy court's consideration of parol evidence because it made parol evidence arguments to that

court. CWVEC thus did not have the right to terminate the CSA upon a transfer of the Coke Plant

to the Joint Venture.

## C. CWVEC's Counterclaim in the West Virginia Litigation

The Federal Rules of Bankruptcy Procedure state that Federal Rule of Civil Procedure 13

applies in adversary proceedings. Fed. R. Bankr. P. 7013. Rule 13(a) provides that

> [a] pleading shall state as a counterclaim any claim which at the time of serving the
> pleading the pleader has against any opposing party, if it arises out of the transaction
> or occurrence that is the subject matter of the opposing party's claim and does not
> require for its adjudication the presence of third parties of whom the court cannot
> acquire jurisdiction.

Fed. R. Civ. P. 13(a). An opposing party's failure to plead a compulsory counterclaim "forever bars

that party from raising the claim in another action." *Bluegrass Hosiery, Inc. v. Speizman Indus., Inc.*,

214 F.3d 770, 772 (6th Cir. 2000); *Sanders v. First Nat'l Bank & Trust Co. in Great Bend*, 936 F.2d

273, 277 (6th Cir. 1991). We have recognized that this rule "serves the desirable goal of bringing

all claims arising out of the same transaction or occurrence before the court in a single action."

*Bluegrass Hosiery*, 214 F.3d at 772. We apply the "logical relationship" test in determining whether

a claim is a compulsory counterclaim; under that test, the court "determine[s] whether the issues of

law and fact raised by the claims are largely the same and whether substantially the same evidence

would support or refute both claims." *Sanders*, 936 F.2d at 277.

On appeal, CWVEC claims that the requirements issue and the declaratory judgment

litigation raise "completely different" issues of law and fact because the requirements issue "has no

affect on, and is not affected by," the declaratory judgment litigation. In support of this claim,

CWVEC contends that in the West Virginia Litigation, it did not claim that the CSA was

unenforceable, as it contended in the Adversary Proceeding; rather, it claimed that the CSA applies only to Wheeling-Pitt, not to Severstal. CWVEC thus argues that there was no need to address the parties' rights under the CSA's quantity provision in the Adversary Proceeding because upon assignment of the CSA, CWVEC's obligations regarding the quantity due under performance would remain the same as before the assignment. CWVEC also argues that discovery in connection with the requirements issue would have delayed the resolution of the Adversary Proceeding.

The bankruptcy court did not err in holding that the requirements issue was a compulsory counterclaim that CWVEC waived by not pursuing when it raised its assignability claim in the Adversary Proceeding. Substantially the same issue is presented in the West Virginia Litigation as was presented in the Adversary Proceeding, namely the ongoing validity and enforceability of the CSA. In the West Virginia Litigation, CWVEC proposed that the CSA is only binding as to Wheeling-Pitt's coal requirements, not to those of the Joint Venture. This interpretation calls into question CWVEC's contractual obligations to the Joint Venture under the CSA, just as in the Adversary Proceeding in which CWVEC argued the fact that the Joint Venture was not a wholly owned subsidiary of Wheeling-Pitt gave rise to CWVEC's right to cease performance of the CSA entirely.

Substantially the same evidence would have been necessary to decide the two claims as well. As demonstrated by the district court opinion, which actually reached the requirements issue, the evidence necessary to resolve that issue consists of the CSA and the Letter Agreement, the same evidence that we used above to resolve the assignability issue. Furthermore, in the Adversary

Proceeding CWVEC requested projections of the Joint Venture's future total coke production and coal requirements as well as Wheeling-Pitt's projected future coke requirements.

CWVEC's argument before this Court ignores the entire context of the Adversary Proceeding. As the bankruptcy court noted, the declaratory judgment complaint "gives a whole description" of the proposed joint venture and the assignment to that joint venture and asks for a declaratory judgment "to assign its rights under the Agreement to any entity that is created to implement the proposed joint venture." J.A. at 668. Accordingly, there is absolutely no merit to the assertion that CWVEC was "blindsided" by the requirements issue. An examination of the declaratory judgment complaint reveals that this result "serves the desirable goal of bringing all claims arising out of the same transaction or occurrence before the court in a single action," *Bluegrass Hosiery*, 214 F.3d at 772, notwithstanding CWVEC's unsupported contention that the requirements issue would have delayed the Adversary Proceeding. The propriety of this result is further apparent given that a declaratory judgment is designed to settle the entire controversy set out in a declaratory judgment complaint, *see Adrian Energy Assocs. v. Mich. Pub. Serv. Comm'n*, 481 F.3d 414, 422 (6th Cir. 2007), and that the declaratory judgment complaint encompassed both CWVEC's right to terminate and the amount of coal CWVEC was required to supply to the Coke Plant.

## D. CWVEC's Remaining Claims

CWVEC's remaining arguments are dismissed in short order. First, its contention that the counterclaim should be allowed to proceed because the requirements issue was not at issue, litigated, or decided, is unconvincing. As stated above, the issue was substantially the same as the issue in the

Adversary Proceeding, CWVEC's attempt to narrowly describe the Adversary Proceeding issue notwithstanding. Second, as Wheeling-Pitt points out, CWVEC confuses compulsory counterclaim law with the law of preclusion with respect to whether the requirements issue was litigated or decided. As set forth above, application of the compulsory counterclaim rule does not depend on whether the requirements issue was actually litigated or decided.

CWVEC also claims that the requirements issue was not mature during the declaratory judgment litigation. It argues that no actual controversy then existed regarding the quantity provision of the CSA because at the time of the Adversary Proceeding, Wheeling-Pitt had not yet consummated the Joint Venture. The ripeness doctrine, however, does not require the harm to have actually occurred. *See Pac. Gas & Elec. Co. v. State Energy Res. Conservation*, 461 U.S. 190, 201 (1983) ("One does not have to await the consummation of threatened injury to obtain preventive relief."). That proposition is particularly applicable in the instant case, as Wheeling-Pitt sought a declaratory judgment, the useful purpose of which is the clarification of legal duties for the future. *AmSouth Bank v. Dale*, 386 F.3d 763, 786 (6th Cir. 2004). Indeed, at the time Wheeling-Pitt filed its complaint for declaratory relief, it was in bankruptcy, and it stated that it "could not consummate its proposed joint venture without assurance the Agreement may be assigned in connection with the joint venture, because any uncertainty as to the effect of the assignment significantly affects the value of the proposed joint venture." J.A. at 22. Accordingly, CWVEC's ripeness argument lacks merit.

CWVEC also contends that Rule 13(a) does not apply to expedited matters and that the declaratory judgment litigation in the instant case was held on an expedited basis. CWVEC relies on *United States v. Snider*, 779 F.2d 1151 (6th Cir. 1985), but that case is inapplicable here. In

*Snider*, we stated that Rule 13(a) requires compulsory counterclaims only if the party who desires to assert a claim has served a pleading, because the Rule requires the adverse party to state its counterclaims "at the time of serving a pleading." 779 F.2d at 1157. Our subsequent cases have so interpreted *Snider*. *See Bluegrass Hosiery*, 214 F.3d at 772; *United States v. Erie Indus., Inc.*, No. 95-2075, 1996 WL 692092, at *1 (6th Cir. Nov. 26, 1996); *Pukyrys v. Olson*, No. 95-1778, 1996 WL 636140, at *2 (6th Cir. Oct. 30, 1996). CWVEC cites no authority for its extension of *Snider* to all "expedited matters," and we decline its invitation to so extend our precedent.

Finally, CWVEC argues that the bankruptcy court lacked jurisdiction and the power to issue the injunction. It claims that in doing so, the bankruptcy court went beyond enforcing its initial rulings and that the All Writs Act should not have been invoked because the counterclaim was not a collateral attack on the bankruptcy court's ruling. These arguments are unpersuasive. We have consistently stated that although district courts may not alter or enlarge the scope of their judgments pending appeal, they do retain jurisdiction to enforce their judgments. *See, e.g.*, *City of Cookeville, Tenn. v. Upper Cumberland Elec. Membership*, ___ F.3d ___, Nos. 05-5886, 06-5363, 2007 WL 1146456, at *10 (6th Cir. Apr. 19, 2007); *Am. Town Ctr. v. Hall 83 Assocs.*, 912 F.3d 104, 110 (6th Cir. 1990) (recognizing "the crucial distinction between *expansion* and *enforcement* of judgments"). For the reasons stated above, CWVEC's counterclaim in the West Virginia Litigation is a claim it waived. Thus, the bankruptcy court not only had the authority to issue the injunction pursuant to our case law, but it also had such authority pursuant to the All Writs Act, *Sable v. Gen. Motors Corp.*, 90 F.3d 171, 175 (6th Cir. 1996) (emphasizing that the Supreme Court has "repeatedly recognized

the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued").

### III.  CONCLUSION

For the foregoing reasons, we AFFIRM the orders of the district court.