IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2022 Term

_____

No. 21-0729

_____

FILED

June 14, 2022

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

SWN PRODUCTION COMPANY, LLC, and EQUINOR USA ONSHORE
PROPERTIES INC., Defendants Below, Petitioners,

v.

CHARLES KELLAM, PHYLLIS KELLAM, and all other persons and entities similarly
situated, Plaintiffs Below, Respondents.

_____

Certified Question from the United States District Court
for the Northern District of West Virginia
The Honorable John Preston Bailey, United States District Judge
Civil Action No. 5:20-cv-85

CERTIFIED QUESTIONS ANSWERED

_____

Submitted: May 17, 2022
Filed: June 14, 2022

Marc S. Tabolsky, Esq.
SCHIFFER HICKS JOHNSON PLLC
Houston, Texas
Elbert Lin, Esq.
HUNTON ANDREWS KURTH LLP
Richmond, Virginia
Timothy M. Miller, Esq.
Jennifer J. Hicks, Esq.
Katrina N. Bowers, Esq.
BABST, CALLAND, CLEMENTS, & ZOMNIR,
P.C.
Charleston, West Virginia
Counsel for Petitioners

James G. Bordas III, Esq.
Richard A. Monahan, Esq.
BORDAS & BORDAS, PLLC
Wheeling, West Virginia
Counsel for Respondents

Scott A. Windom, Esq.
WINDOM LAW OFFICES, PLLC
Harrisville, West Virginia
Anthony J. Majestro, Esq.
POWELL & MAJESTRO, PLLC
Charleston, West Virginia

Counsel for Amici Curiae West Virginia Land and Mineral Owners Association and West Virginia Association for Justice

W. Henry Lawrence, Esq.
Amy M. Smith, Esq.
STEPTOE & JOHNSON PLLC
Bridgeport, West Virginia
Counsel for Amici Curiae American Petroleum Institute, Gas and Oil Association of WV, Inc., and West Virginia Chamber of Commerce

Howard M. Persinger, III, Esq.
Persinger & Persinger, L.C.
Charleston, West Virginia
Counsel for Amici Curiae West Virginia Royalty Owners' Association, West Virginia Farm Bureau, Bounty Minerals LLC and Siltstone Resources, LLC

Michael W. Carey, Esq.
David R. Pogue, Esq.
Carey, Douglas, Kessler & Ruby, PLLC
Charleston, West Virginia
Marvin W. Masters, Esq.
April D. Ferrebee, Esq.
The Masters Law Firm LC
Charleston, West Virginia
Counsel for Amicus Curiae National Association of Royalty Owners, Appalachia

JUSTICE WOOTON delivered the Opinion of the Court.

JUSTICE ARMSTEAD, deeming himself disqualified, did not participate in this decision. JUDGE HOWARD sitting by temporary assignment.

JUSTICE BUNN, deeming herself disqualified, did not participate in this decision. JUDGE ALSOP sitting by temporary assignment.

CHIEF JUSTICE HUTCHISON concurs and reserves the right to file a separate opinion.

JUSTICE WALKER dissents and reserves the right to file a separate opinion.

SYLLABUS BY THE COURT

1.      "When a certified question is not framed so that this Court is able to fully address the law which is involved in the question, then this Court retains the power to reformulate questions certified to it under . . . the Uniform Certification of Questions of Law Act found in W. Va. Code, 51-1A-1, *et seq.* . . . ." Syl. Pt. 3, in part, *Kincaid v. Mangum*, 189 W. Va. 404, 432 S.E.2d 74 (1993).

2.      "'A de novo standard is applied by this Court in addressing the legal issues presented by a certified question from a federal district or appellate court.' Syllabus Point 1, *Light v. Allstate Ins. Co.*, 203 W.Va. 27, 506 S.E.2d 64 (1998)."  Syl. Pt. 1, *Martinez v. Asplundh Tree Expert Co.*, 239 W. Va. 612, 803 S.E.2d 582 (2017).

3.      "If an oil and gas lease provides for a royalty based on proceeds received by the lessee, unless the lease provides otherwise, the lessee must bear all costs incurred in exploring for, producing, marketing, and transporting the product to the point of sale."  Syl. Pt. 4, *Wellman v. Energy Resources, Inc.*, 210 W. Va. 200, 557 S.E.2d 254 (2001).

4.      "If an oil and gas lease provides that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale, the lessee shall be entitled to credit for those costs to the extent that they were actually incurred and they were

i

reasonable. Before being entitled to such credit, however, the lessee must prove, by evidence of the type normally developed in legal proceedings requiring an accounting, that he, the lessee, actually incurred such costs and that they were reasonable." Syl. Pt. 5, *Wellman v. Energy Resources, Inc.*, 210 W. Va. 200, 557 S.E.2d 254 (2001).

5. "Language in an oil and gas lease that is intended to allocate between the lessor and lessee the costs of marketing the product and transporting it to the point of sale must expressly provide that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale, identify with particularity the specific deductions the lessee intends to take from the lessor's royalty (usually 1/8), and indicate the method of calculating the amount to be deducted from the royalty for such post-production costs." Syl. Pt. 10, *Estate of Tawney v. Columbia Natural Resources, LLC.*, 219 W. Va. 266, 633 S.E.2d 22 (2006).

6. "An appellate court should not overrule a previous decision recently rendered without evidence of changing conditions or serious judicial error in interpretation sufficient to compel deviation from the basic policy of the doctrine of stare decisis, which is to promote certainty, stability, and uniformity in the law." Syl. Pt. 2, *Dailey v. Bechtel Corp.*, 157 W. Va. 1023, 207 S.E.2d 169 (1974).

WOOTON, Justice:

The United States District Court for the Northern District of West Virginia has certified four questions to this Court, which seek to clarify whether, in payment of royalties under an oil and gas lease, the lessor may be required to bear a portion of the post-production costs incurred in rendering the oil and gas marketable. First, the district court poses this overarching question:

> Is *Estate of Tawney v. Columbia Natural Resources, LLC.*, 219 W. Va. 266, 633 S.E.2d 22 (2006), still good law in West Virginia?

We answer this question in the affirmative.

The District Court then asks us to expound upon our holding in *Tawney* by posing the following three questions:

> What is meant by the "method of calculating" the amount of post-production costs to be deducted?
>
> Is a simple listing of the types of costs which may be deducted sufficient to satisfy *Tawney*?
>
> If post-production costs are to be deducted, are they limited to direct costs or may indirect costs be deducted as well?

We find that these are questions of contract interpretation which may only be answered by the Court and a factfinder, as appropriate, upon consideration of the lease in question and other relevant evidence, through application of the holdings in *Tawney,* its predecessor, *Wellman v. Energy Resources, Inc.*, 210 W. Va. 200, 557 S.E.2d 254 (2001), and applicable

1

contract law. In this regard, we recognize our authority to reformulate questions certified to this Court:

> When a certified question is not framed so that this Court is able to fully address the law which is involved in the question, then this Court retains the power to reformulate questions certified to it under . . . the Uniform Certification of Questions of Law Act found in *W. Va. Code,* 51-1A-1, *et seq.* . . ."

Syl. Pt. 3, in part, *Kincaid v. Mangum*, 189 W. Va. 404, 432 S.E.2d 74 (1993); *see also* W. Va. Code § 51-1A-4 (2018) ("The Supreme Court of Appeals of West Virginia may reformulate a question certified to it."). We exercise our authority to reformulate and more succinctly phrase these three questions into a single question as follows:

> What level of specificity does *Tawney* require of an oil and gas lease to permit the deduction of post-production costs from a lessor's royalty payments, and if such deductions are permitted, what types of costs may be included?

The answer to this question necessarily involves the exploration of contractual language, the possible need for interpretation of said language, and the development of facts to assist either the court or the factfinder, as appropriate. Therefore, we decline to answer the reformulated question.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In August 2007, Respondents Charles and Phyllis Kellam (hereinafter "the Kellams" or "Respondents") entered into an oil and gas lease agreement (the "Kellam Lease") with Great Lakes Energy Partners, LLC ("Great Lakes"). Sometime thereafter, Great Lakes assigned the lease to Chesapeake Appalachia, LLC ("Chesapeake") from

whom Petitioners SWN Production Company, LLC ("SWN") and Equinor USA Onshore

Properties Inc. ("Equinor") acquired working interests in the lease. SWN now operates oil

and gas wells, and production units within which the Kellams' leased lands are included.

Since SWN and Equinor acquired working interests in the Kellam Lease, the parties have

all engaged in oil and gas production efforts under the terms of that lease, which provides,

in pertinent part:

> 4. In consideration of the premises the Lessee covenants and agrees:
>
> (A) To deliver to the credit of the Lessor in tanks or pipelines, as royalty, free of cost, one-eighth (1/8) of all oil produced and saved from the premises, or at Lessee's option to pay Lessor the market price for such one-eighth (1/8) royalty oil at the published rate for oil of like grade and gravity prevailing on the dates such oil is sold into tanks or pipelines. Payment of royalty for oil marketed during any calendar month to be on or about the 60th day after receipt of such funds by the Lessee.
>
> (B) To pay to the Lessor, as royalty for the oil, gas, and/or coalbed methane gas marketed and used off the premises and produced from each well drilled thereon, the sum of one-eighth (1/8) of the price paid to Lessee per thousand cubic feet of such oil, gas, and/or coalbed methane gas so marketed and used, measured in accordance with Boyle's Law for the measurement of gas at varying pressures, on the basis of 10 ounces above 14.73 pounds atmospheric pressure, at a standard base temperature of 60 degrees Fahrenheit, without allowance for temperature and barometric variations *less any charges for transportation, dehydration and compression paid by Lessee to deliver the oil, gas, and/or coalbed methane gas for sale.* Payment for royalty for oil, gas, and/or coalbed methane gas marketed during any calendar month to be on or about the 60th day after receipt of such funds by the Lessee.

(Emphasis added).

3

Paragraph 10 of the Kellam Lease addresses unitization and provides that, if the leased premises are consolidated with other lands to form a development unit, "the Lessor agrees to accept, in lieu of the one-eighth (1/8) oil, gas, and/or coalbed methane gas royalty hereinbefore provided, that proportion of such one-eighth (1/8) royalty which the acreage consolidated bears to the total number of acres compromising said development unit." Finally, Paragraph 11 of the Kellam Lease provides that, "[i]n case the Lessor owns a less interest in the above described premises than the entire and undivided fee simple therein, then the royalties and rentals herein provided for shall be paid to the Lessor only in the proportion which such interest bears to the whole and undivided fee."

According to the Kellams, SWN and Equinor "each have deducted postproduction costs from royalty checks due and payable to [the Kellams] and other similarly situated persons and/or entities." As such, on April 28, 2020, the Kellams instituted the underlying civil action—a putative class action—in the United States District Court for the Northern District of West Virginia, arguing that those deductions were in contravention of this Court's holdings in *Tawney* and *Wellman* because the terms of the lease lack the specificity required under *Tawney* to permit the deduction of post-production costs. While acknowledging that the royalty language provides for the deduction of certain charges for "transportation, dehydration, and compression," they argue the lease fails to include a "method of calculating the amount to be deducted from the royalty share for such post-production costs" as required by *Tawney*. *See Tawney*, 219 W. Va. at 268, 633 S.E.2d at 24, syl. pt. 10 ("Language in an oil and gas lease that is intended to allocate between the

4

lessor and lessee the costs of marketing the product and transporting it to the point of sale must expressly provide that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale, identify with particularity the specific deductions the lessee intends to take from the lessor's royalty (usually 1/8), and indicate the method of calculating the amount to be deducted from the royalty for such post-production costs.").

After a short delay in the proceedings caused by a stay issued pending the resolution of Chesapeake's voluntary Chapter 11 petition in the United States Bankruptcy Court for the Southern District of Texas, SWN and Equinor filed answers to the Kellams' complaint in July 2021. Contemporaneously, SWN and Equinor moved for judgment on the pleadings, seeking dismissal of all of the Kellams' claims with prejudice. In so doing, SWN and Equinor argued that the Kellam Lease satisfied the requirements set forth in *Tawney*. Once briefing was complete, on September 13, 2021, the district court, sua sponte, certified the four questions set forth more fully above. We accepted the certified questions and placed this matter on the docket for argument under Rule 20 of the West Virginia Rules of Appellate Procedure.[1]

---

[1] This Court would like to acknowledge the participation in this case of the following amici curiae: the West Virginia Land and Mineral Owners Association, the West Virginia Association for Justice, the American Petroleum Institute, the Gas and Oil Association of WV, Inc., the West Virginia Chamber of Commerce, the National Association of Royalty Owners, Appalachia, the West Virginia Royalty Owners' Association, the West Virginia Farm Bureau, Bounty Minerals LLC and Siltstone Resources, LLC. We have considered the arguments presented by the amici curiae in deciding this case.

## II. STANDARD OF REVIEW

This Court has long held that "'[a] de novo standard is applied by this Court in addressing the legal issues presented by a certified question from a federal district or appellate court.' Syllabus Point 1, *Light v. Allstate Ins. Co.*, 203 W.Va. 27, 506 S.E.2d 64 (1998)." Syl. Pt. 1, *Martinez v. Asplundh Tree Expert Co.*, 239 W. Va. 612, 803 S.E.2d 582 (2017). Our resolution of the certified questions at issue will be guided by this standard.

## III. DISCUSSION

### A. Is *Tawney* still good law in West Virginia?

The first certified question simply asks whether *Tawney* is still "good law" in West Virginia. *See* 219 W. Va. 266, 633 S.E.2d 22. The district court indicated its belief that *Tawney* remained good law, despite SWN and Equinor's contention that its potential overruling was suggested in *Leggett v. EQT Production Co.*, 239 W. Va. 264, 800 S.E.2d 850 (2017). In order to address this question, it is necessary to summarize the legal developments that led to it in the first place. Over twenty years ago, this Court issued its opinion in *Wellman*, wherein we essentially held that: (1) lessees may not deduct post-production costs unless the lease agreement explicitly permits such deductions; and (2) where there is such a provision, only reasonable and actually incurred expenses may be deducted. We held:

> If an oil and gas lease provides for a royalty based on proceeds received by the lessee, unless the lease provides otherwise, the lessee must bear all costs incurred in exploring

6

> for, producing, marketing, and transporting the product to the point of sale.
>
> If an oil and gas lease provides that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale, the lessee shall be entitled to credit for those costs to the extent that they were actually incurred and they were reasonable. Before being entitled to such credit, however, the lessee must prove, by evidence of the type normally developed in legal proceedings requiring an accounting, that he, the lessee, actually incurred such costs and that they were reasonable.

*Wellman*, 210 W. Va. at 202, 557 S.E.2d at 256, syl. pts. 4 and 5. These holdings firmly cemented West Virginia as a "marketable product rule" state, meaning that the lessee bears all post-production costs incurred until the product is first rendered marketable, unless otherwise indicated in the subject lease.

*Wellman* arose from two oil and gas leases which contained standard one-eighth royalty clauses. Of note, there was no provision under the terms of the lease for the deduction of post-production costs. The lessee, Energy Resources, Inc., extracted gas from a pre-existing well under one of the leases and sold that gas to Mountaineer Gas Company for $2.22 per thousand cubic feet. Energy Resources paid the Wellmans a royalty claiming that it had actually received only $0.87 per thousand cubic feet of gas extracted, and so the Wellmans received approximately $0.11 per thousand cubic feet of gas. Energy Resources indicated to the Wellmans that it arrived at these figures by deducting "certain expenses" from the $2.22 per thousand cubic feet of gas it had been paid by Mountaineer Gas Company. The Wellmans thereafter instituted a civil action arguing, in pertinent part, that

the deduction of those expenses was contrary to the terms of the lease. Ultimately, the Wellmans moved for summary judgment on this point and the circuit court granted that motion, finding that Energy Resources had failed to show that it was entitled to deduct any expenses from the one-eighth royalty, and by taking those deductions, it had essentially short-changed the Wellmans. *Id*. at 203-05, 557 S.E.2d at 257-59.

On appeal, this Court was presented with a matter of first impression: whether, in the absence of lease language permitting the deduction of post-production costs, a lessee was entitled to deduct such costs prior to calculating a lessor's royalty payment. In concluding that the answer was no, this Court surveyed the laws of other states to determine whether such deductions were permissible. At that time we recognized that only two states had permitted these deductions in the absence of an explicit lease provision to that effect (Louisiana and Texas), while several others did not allow the deductions in absence of a lease provision to that effect. Ultimately, we agreed with the jurisdictions who took the latter path, reasoning:

> The rationale for holding that a lessee may not charge a lessor for "post-production" expenses appears to be most often predicated on the idea that the lessee not only has a right under an oil and gas lease to produce oil or gas, but he also has a duty, either express, or under an implied covenant, to market the oil or gas produced. The rationale proceeds to hold the duty to market embraces the responsibility to get the oil or gas in marketable condition and actually transport it to market.

*Id*. at 210, 557 S.E.2d at 264. Leaning on the analysis of the Colorado Supreme Court in *Garman v. Conoco*, 886 P.2d 652 (Colo. 1994), we explained that under the implied

covenant to market, the lessee "had a duty to market oil and gas produced, and since under the law it was required to pay the costs to carry out its covenants, it had the duty to bear the costs of preparing the oil and gas for market and to pay the cost of transporting them to market." 210 W. Va. at 210, 557 S.E.2d at 264. Essentially, it is the lessee's burden to bear post-production costs, unless the lease provides otherwise. *Id*. at 211, 557 S.E.2d at 265.

We adopted the reasoning of the Colorado Supreme Court—as well as the reasoning then employed in Kansas and Oklahoma—finding that

> [l]ike those states, West Virginia holds that a lessee impliedly covenants that he will market oil or gas produced. Like the courts of Colorado, Kansas, and Oklahoma, the Court also believes that historically the lessee has had to bear the cost of complying with his covenants under the lease. It, therefore, reasonably should follow that the lessee should bear the costs associated with marketing products produced under a lease. Such a conclusion is also consistent with the long-established expectation of lessors in this State, that they would receive one-eighth of the sale price received by the lessor.

*Id*. at 211, 557 S.E.2d at 265 (internal citations omitted). Thereafter, we set out the holdings discussed *supra*, establishing a rule that unless a lease provides for the deduction of post-production costs, the lessee must bear those costs by default. *Id*. at 202, 557 S.E.2d at 256, syl. pts. 4 and 5.

Five years later, we were once again asked to wade into the waters of post-production costs in *Tawney*. *Tawney* presented this Court with two certified questions from

9

the Circuit Court of Roane County, West Virginia, asking whether certain specific lease language stating that royalties were to be calculated "at the wellhead" was sufficient to permit the deduction of post-production costs. *See* 219 W. Va. at 268-69, 633 S.E.2d at 24-25. The arguments presented by Columbia Natural Resources ("CNR")—the lessee in that case—essentially posited that gas was not sold at the wellhead, but to a supplier downstream, so it was only logical that the lessee be permitted to deduct post-production costs incurred in making the gas marketable at a point of sale. *Id*. at 270, 633 S.E.2d at 26. We rejected this contention on the basis that the "at the wellhead" language was flatly ambiguous insofar as it was imprecise. As we stated,

> [w]hile the language arguably indicates that the royalty is to be calculated at the well or the gas is to be valued at the well, the language does not indicate *how* or *by what method* the royalty is to be calculated or the gas is to be valued. For example, notably absent are any specific provisions pertaining to the marketing, transportation, or processing of the gas. In addition, in light of our traditional rule that lessors are to receive a royalty for the sale price of gas, the general language at issue simply is inadequate to indicate an intent by the parties to agree to a contrary rule—that the lessors are not to receive 1/8 of the sale price but rather 1/8 of the sale price less a proportionate share of deductions for transporting and processing the gas.

*Id*. at 272, 633 S.E.2d at 28. In that case, we reiterated that our default rule is that lessees bear the brunt of post-production costs absent lease language shifting that cost—or a portion thereof—to the lessor. *Id*. Accordingly, the question of whether such language exists in the lease is a matter of contract interpretation.

10

We observed that parties to oil and gas leases are well within their rights to contract for the sharing of post-production costs if they so choose, but the intent to do so must be clear from the lease terms. To that end, we held that

> [l]anguage in an oil and gas lease that is intended to allocate between the lessor and lessee the costs of marketing the product and transporting it to the point of sale must expressly provide that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale, identify with particularity the specific deductions the lessee intends to take from the lessor's royalty (usually 1/8), and indicate the method of calculating the amount to be deducted from the royalty for such post-production costs.

*Id*. at 268, 633 S.E.2d at 24, syl. pt. 10. This holding sets forth three basic requirements for determining whether a lease enforceably permits the sharing of post-production costs: (1) language explicitly stating the lessor will bear some portion of those costs; (2) identification of the deductions the lessee intends to make; and (3) the method of calculating the amount to be deducted.

For another eleven years, thousands of oil and gas leases in this State—including the Kellams' own lease—were crafted with this standard in mind. However, in 2017, the Court was called upon to again address the deduction of post-production expenses, albeit in a different context, in *Leggett v. EQT Production Co.*, 239 W. Va. 264, 800 S.E.2d 850 (2017).

*Leggett* was a set of certified questions from the United States District Court for the Northern District of West Virginia, asking whether our decision in *Tawney* applied

11

to bar the deduction of post-production costs with regard to leases governed by West Virginia Code § 22-6-8(e) (1994).[2] *See* 239 W. Va. at 267, 800 S.E.2d at 853. Without delving too far into the specifics of *Leggett*, it is sufficient to state that we held that the unambiguous language used by the Legislature in § 22-6-8(e) permitted royalty payments made pursuant to leases governed by that statute to be subject to pro-rata deduction or allocation of all reasonable post-production expenses actually incurred by the lessee. *Id*. In short order following the issuance of *Leggett*, in 2018 the Legislature amended § 22-6-8(e), effectively overruling that decision and specifically altering the language of that Code provision to state that royalty payments under that section were to be "free from any deductions for post-production expenses." W. Va. Code § 22-6-8(e) (2021).

It is *Leggett* which forms the basis of the SWN and Equinor's instant challenges to the current validity of *Tawney* and precipitated the district court's first certified question. This is so because this Court in *Leggett* undertook an examination of the legal underpinnings of *Wellman* and *Tawney*, while correctly noting that neither case,

---

[2] West Virginia Code § 22-6-8 was crafted for the explicit purpose of converting so-called flat rate oil and gas leases into leases which pay a royalty based on the volume of oil and gas produced or marketed. "Flat rate" leases are leases wherein the lessors are paid an annual fee based solely on the existence of a producing well on the property. *See id.; see also Leggett*, 239 W. Va. at 267, 800 S.E.2d at 853. The Legislature, perceiving that these leases provided inadequate compensation to lessors, crafted a mechanism to convert these leases into volume-based royalty leases. Essentially, under this statute, any lessee seeking a permit to drill, redrill, deepen, fracture, stimulate, pressurize, convert, combine, or physically change a well under a flat rate lease is required to file an affidavit certifying that the lessee will pay to the lessor a minimum one-eight royalty of the gross proceeds from the sale of oil and as produced from those wells. W. Va. Code § 22-6-8(d)-(e).

12

nor the implied covenant to market upon which they are founded, were applicable to its analysis of West Virginia Code § 22-6-8(e). *See Leggett*, 239 W. Va. at 275-76, 800 S.E.2d at 861-62 ("Accordingly, the implied covenant to market relied upon by the *Wellman* and *Tawney* Courts has no application as pertains to leases affected by West Virginia Code § 22-6-8."); *see also id.* at 276, 800 S.E.2d at 862 ("We therefore conclude that neither *Wellman* nor *Tawney* are applicable to an analysis of the 'at the wellhead' language contained in West Virginia Code § 22-6-8(e).").

The *Leggett* Court's conclusion in this regard was correct because leases under section 22-6-8 are entirely creatures of statute, unlike the freely negotiated *contractual* provisions addressed in *Tawney* and *Wellman*. As we stated in *Leggett*, "[u]tilizing . . . common law principles to interpret a statute . . . is not legally sound." 239 W. Va. at 274, 800 S.E.2d at 860 (citing *Kilmer v. Elexco Land Servs, Inc.*, 990 A.2d 1147, 1155 (Pa. 2010) (recognizing that states adopting the marketable product rule "have done so as a matter of common law in interpreting ambiguities in leases, not through statutory interpretation of a preexisting statute.")). In rejecting the invitation to apply *Wellman* and *Tawney* to section 22-6-8, we explained that the rules of statutory construction and contract interpretation are vastly different. 239 W. Va. at 275, 800 S.E.2d at 861 ("The legal standards applicable to issues of statutory interpretation have evolved separately from those involving matters of contract interpretation. Thus, despite the fact that . . . statutory and contractual language are essentially identical, it is theoretically possible that the application of each set of legal standards would yield divergent results. . . .") (citing *Major Oldsmobile,*

13

*Inc. v. Gen. Motors Corp.*, No. 93-Civ-2189 (SWK), 1995 WL 326475, at *4 (S.D.N.Y.

May 31, 1995), *aff'd*, 101 F.3d 684 (2d Cir. 1996)).

Moreover, the *Leggett* Court intimated that a key feature of freely negotiated

lease agreements was that the parties may limit the implied covenants—like the implied

covenant to market—which append to those leases. *Leggett*, 239 W. Va. at 275, 800 S.E.2d

at 861. However, "the implied covenant to market does not append itself to statutes; rather

it is a tool utilized to resolve contractual ambiguities." *Id*. We observed that implied

covenants are generally recognized to be "gap fillers" to effectuate the parties' intentions

in forming the contract when the contract is silent on a particular issue. *Id*. (citing *Allen v.*

*Colonial Oil Co.*, 92 W. Va. 689, 115 S.E. 842, 844 (1923)). In applying these basic

concepts, the *Leggett* Court then explained why neither the implied covenant to market nor

the cases which are founded upon it were applicable to its interpretation of section 22-6-8:

> In this instance, at the times these leases were executed, the
> parties contemplated neither the marketing of the product and
> any implied covenants thereof, nor cost allocation because the
> leases were flat-rate leases. The lessor's royalty issued
> irrespective of production, making post-production costs and
> the marketing efforts of the lessor irrelevant to both parties for
> purposes of the lease. Only by operation of West Virginia
> Code § 22-6-8(e), then, is cost allocation implicated in the
> parties' dealings. *Accordingly, without the commensurate*
> *ability to bargain about allocation of costs or limit any implied*
> *covenants which may affect cost-bearing, utilizing cases which*
> *are premised on these considerations is of limited utility at best*
> *and inequitable at worst.* Dogmatic imposition, therefore, of
> West Virginia's so-called marketable product rule—which was
> developed upon these considerations—to prohibit allocation of
> postproduction expenses as requested by the petitioners yields

little parity when the parties were not free to contract otherwise.

*Moreover, use of this Court's cases involving freely negotiated contracts—which were decided years after the statute at issue was enacted—to foster a reading of the statute which affects the terms of a contract regarding matters which were not within the contemplation of the parties is potentially problematic on a constitutional level.* This Court has stated that "those who enter into contracts do so with reference to the law as it exists at the date thereof; and any impairment by legislative action, or otherwise, of an obligation thus created, is plainly inhibited by both the State and Federal Constitutions." *McClintic v. Dunbar Land Co.*, 127 W.Va. 454, 461, 33 S.E.2d 593, 596 (1945). While West Virginia Code § 22-6-8 itself is cognizant of the delicate balancing act it undertakes to avoid unconstitutionally impairing contractual rights by affecting only the issuance of permits, extending the statute beyond that procedural prerequisite into the terms of the negotiated lease between the parties is dangerous territory. In interpretation of a statute, it is not for this Court to attempt to "retrofit" this Court's caselaw to give meaning to a statute enacted well before such precedent, particularly when such precedent employs a rationale wholly inapplicable to statutory construction and so substantially affects the contracting parties' rights. *We therefore conclude that neither Wellman nor Tawney are applicable to an analysis of the "at the wellhead" language contained in West Virginia Code § 22-6-8(e).*

*Id*. (emphasis added and citation omitted). In essence, the Court openly acknowledged that neither *Wellman* and *Tawney* nor the implied covenant to market had any place in its interpretation of West Virginia Code § 22-6-8(e).

In explicitly recognizing that the common law standards set forth in *Wellman* and *Tawney* did not apply to the issue before it, the *Leggett* Court even reformulated the certified question presented to remove any reference to *Tawney*, and instead asked simply:

15

"Are royalty payments pursuant to an oil or gas lease governed by West Virginia Code §

22-6-8(e) (1994) subject to pro-rata deduction or allocation of post-production expenses

by the lessee?" *Leggett*, 239 W. Va. at 281, 800 S.E.2d at 867. Yet, despite these consistent

acknowledgments that *Tawney* was utterly inapplicable to the case at bar, the *Leggett* Court

engaged in a somewhat indulgent frolic into what it deemed the "faulty legs" upon which

*Tawney*—and its predecessor *Wellman*—stood. *Id*. at 276, 800 S.E.2d at 862.[3]

---

[3] The *Leggett* Court's primary criticism of these cases was that "the use of the implied covenant to market to reach the issue of [post-production] cost allocation is highly questionable." 239 W. Va. 275 n.15, 800 S.E.2d 861 n.15. In making this statement, the majority in that case cited to cases from jurisdictions which have not extended their implied covenants in this way, but glossed over the fact that at least four states other than West Virginia have done precisely the opposite. The highest courts of Colorado, Kansas, Oklahoma, and Arkansas have all recognized, just as we did in *Wellman*, that the implied duty to market necessarily encompasses a duty to render the product marketable, which includes bearing the cost of doing so absent a lease provision to the contrary. Despite this, the *Leggett* Court parroted one author's concern that the implied covenant to market has exceeded its original intent and "should be confined to its original purpose: to require the lessee to diligently seek a market for gas reserves that are shut in." *Id*. (citing Owen L. Anderson, *Royalty Valuation: Should Royalty Obligations Be Determined Intrinsically, Theoretically, or Realistically?* Part 2, 37 Nat. Res. J. 611, 683 n. 89 (1997)). The problem with this assertion is that it is not clear that the implied duty to market was ever truly limited in such a way. *See, e.g., Warfield Nat. Gas Co. v. Allen*, 88 S.W.2d 989, 991 (Ky. 1935) (recognizing that, where a lease was silent on this issue, a lessee bore the expense of producing and marketing oil and gas as consideration for its entitlement to seven-eighths of the proceeds from the sale thereof). Rather, the implied covenant to market is reasonably construed to require a lessee to bear marketing costs, which is the very basis of the marketable product rule we employ today.

In this vein, the *Leggett* majority also contended that *Wellman* failed to recognize interstate variations in the marketable product rule. To the contrary, *Wellman* analyzed the rules surrounding the sharing of post-production costs employed by other states—including Texas, Louisiana, Colorado, Kansas, and Oklahoma. In several of those states, much like in West Virginia, it has long been recognized—even before deregulation of the gas industry in the 1990s—that a lessee impliedly covenants to market the oil and gas it produces under

16

By its own admission, *Leggett's* ensuing discussion of those cases and their "faulty legs" was mere obiter dicta and of no authoritative value to this Court today. Just as the United States Supreme Court has recognized, "we are not bound to follow our dicta in a prior case in which the point now at issue was not fully debated." *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 363 (2006). Accordingly, we see little reason to justify *Leggett's* criticism of *Wellman* and *Tawney* with any further discussion other than to simply reiterate that those cases are the result of a reasonable and justifiable interpretation of this State's common law as evidenced by the fact that several other states employed nearly identical reasoning in concluding that, absent a contract provision to the contrary, the implied covenant to market requires the lessee to bear all post-production costs. This is a

---

the lease. The basic rules employed by those states simply explained that "the implied duty to market means a duty to get the product to the place of sale in marketable form." *Wood v. TXO Prod. Corp.*, 854 P.2d 880, 882 (Okla. 1992); *see also Davis v. Cramer*, 808 P.2d 358, 362 (Colo. 1991) (explaining that the covenant to market requires a lessee to exercise reasonable diligence to market production from the well.); *Sternberger v. Marathon Oil Co.*, 894 P.2d 788, 799 (Kan. 1995) ("The lessee has the duty to produce a marketable product, and the lessee alone bears the expense in making the product marketable."). Even in states that do not employ the marketable product rule today, it was once recognized that the lessee may be impliedly obligated to bear certain costs in marketing oil and gas. *See, e.g., Warfield,* 88 S.W.2d at 991. West Virginia has long applied the same rule. *See* Robert Tucker Donley, *The Law of Coal, Oil and Gas in West Virginia and Virginia* §§ 70 & 104 (1951) (stating that in West Virginia a lessee impliedly covenants he will market oil and gas produced). The only question for us in *Wellman* was whether that rule necessarily required a lessee to bear post-production costs until the gas was marketed. The logical conclusion that it did, unless otherwise provided in the lease, was amply supported by the common law of this State, as well as the guidance of other states employing virtually identical rules.

17

common law doctrine; we are not inclined to revisit the underpinnings of *Wellman* and *Tawney*—despite the parties' and *Leggett's* invitation to do so—for several reasons.

First and foremost, we do not *need* to address our interpretation of the implied covenant of marketability in the case at bar because that covenant is not implicated. In this case there is a contractual provision addressing the allocation of post-production costs such that an implied covenant is not necessary to ascertain the parties' intent in contracting. Specifically, Paragraph 4(B) of the Kellams' lease provides that the lessor shall be paid a one-eighth royalty for the market price of the oil, gas, and coalbed methane gas "less any charges for transportation, dehydration and compression paid by Lessee to deliver the oil, gas, and/or coalbed methane gas for sale." As such, the implied covenant of marketability is clearly inapplicable because, insofar as the lease is not silent on the issue of post-production cost allocation, there is no gap for that implied covenant to fill. The parties have freely negotiated a contract in which they appear to have expressed an intent to share the burden of post-production costs in the manner indicated therein. Therefore, the question whether that provision satisfies the additional requirements set out in *Tawney* that the lease identify with particularity the costs to be deducted and identify a method of calculating those deductions, as explained *infra*, is not a question this Court can answer, but is instead relegated to the finder of fact.

Second, we are compelled by the doctrine of stare decisis to carefully consider whether we are justified in overruling the precedent of this Court. As we

18

explained in syllabus point two of *Dailey v. Bechtel Corp.*, 157 W. Va. 1023, 207 S.E.2d 169 (1974), "[a]n appellate court should not overrule a previous decision recently rendered without evidence of changing conditions or serious judicial error in interpretation sufficient to compel deviation from the basic policy of the doctrine of stare decisis, which is to promote certainty, stability, and uniformity in the law." In our review of the briefs and the appendix record, no one—not even this Court in *Leggett*—has articulated any changing conditions or serious judicial error in interpretation sufficient to overturn *Wellman* and *Tawney*. *See id.* The parties present us with no evidence of substantial changes in the deduction of post-production costs since those decisions were rendered sufficient to justify overruling our longstanding precedent. As to the question of serious juridical error in interpretation, as explained above, *Wellman* and *Tawney* are consistent with decades of oil and gas jurisprudence in this State, as well as general principles of contract which undergird the formation of oil and gas leases—including the use of implied covenants when a lease is silent on an issue. While litigation has arisen under those opinions, that is not indicative of instability or "chaos" but is the "unavoidable consequence" of any opinion of this Court. *Leggett*, 239 W. Va. at 284, 800 S.E.2d at 870 (Workman, J., concurring). In actuality, it is far more likely in our opinion that overruling *Tawney* and *Wellman* would *result* in instability and uncertainty, particularly for the thousands of leases that have been executed in the years since those opinions were published.

In short, neither the parties, nor the *Leggett* Court in criticizing the legal underpinnings of *Wellman* and *Tawney*, have articulated any reason sufficient to justify the

overruling of those cases. Accordingly, we decline to do so, and necessarily conclude that those cases remain in effect. As such, we answer the district court's first certified question in the affirmative: *Tawney* is still good law in West Virginia.

**B.** ***What level of specificity does*** *Tawney* ***require of an oil and gas lease to permit the deduction of post-production costs from a lessor's royalty payments, and if such deductions are permitted, what costs may be included?***

As indicated above, the district court has asked that we clarify what *Tawney* requires when it states that a lease must "identify with particularity the specific deductions the lessee intends to take from the lessor's royalty (usually 1/8), and indicate the method of calculating the amount to be deducted from the royalty for such post-production costs." *Tawney*, 219 W. Va. at 268, 633 S.E.2d at 24, syl. pt. 10. In reviewing the parties' briefs and the district court's certification order, we believe these questions can only be answered by looking to the individual lease at issue and other relevant evidence, thus rendering them, in some instances, questions of contract interpretation which we cannot answer. Specifically, the analysis as to whether a lease agreement is "particular" enough in listing the costs to be deducted will necessarily be different with regard to each contract. Therefore, this Court cannot create a hard and fast rule in that regard insofar as the question is tied directly to the specific language of the lease and, if ambiguous, the parties' intent in contracting.

Moreover, the same is true of determining whether the lease agreement indicates a method of calculating the deductions to be made. That is a matter of contract

20

interpretation, and will necessarily hinge upon the individual contract at issue. As such, we believe whether the individual contract sufficiently identifies a method of calculating the deductions is a matter left in the capable hands of the court and fact-finder, as appropriate. This is because oil and gas lease agreements are simply contracts and are to be construed as such. *See* Syl. Pt. 1, *McCullough Oil, Inc. v. Rezek*, 176 W. Va. 638, 346 S.E.2d 788 (1986) ("An oil and gas lease (or other mineral lease) is both a conveyance and a contract. It is designed to accomplish the main purpose of the owner of the land and of the lessee (or its assignee) as operator of the oil and gas interests: securing production of oil or gas or both in paying quantities, quickly and for as long as production in paying quantities is obtainable.").

We reiterate *Tawney* and *Wellman*'s succinct requirements that leases must meet in order to allocate some share of the post-production costs to the lessor. Specifically, the lease must: (1) include language indicating the lessor will bear some of those costs; (2) identify with particularity the deductions to be made (with an understanding that such deductions must be both reasonable and actually-incurred under *Wellman*); and (3) indicate the method of calculating the amount to be deducted. We see no reason to elaborate on these requirements further; whether a lease meets those requirements is a question of contract interpretation guided by principles of contract law. *See, e.g.*, Syl. Pt. 1, *Lee Enters., Inc. v. Twentieth Century-Fox Film Corp.*, 172 W. Va. 63, 303, S.E.2d 702 (1983) ("While the general rule is that the construction of a writing is for the court; yet where the meaning is uncertain and ambiguous, parol evidence is admissible to show the situation of

21

the parties, the surrounding circumstances when the writing was made, and the practical construction given to the contract by the parties themselves either contemporaneously or subsequently. If the parol evidence be not in conflict, the court must construe the writing; but, if it be conflicting on a material point necessary to interpretation of the writing, then the question of its meaning should be left to the jury under proper hypothetical instructions.")(internal citation omitted); Syl. Pt. 4, *Tawney*, 219 W. Va. at 267-68, 633 S.E.2d at 23-24 ("The term 'ambiguity' is defined as language reasonably susceptible of two different meanings or language of such doubtful meaning that reasonable minds might be uncertain or disagree as to its meaning."); s*ee also Frat. Ord. of Police, Lodge No. 69 v. City of Fairmont*, 196 W. Va. 97, 101 n.7, 468 S.E.2d 712, 716 n.7 (1996) ("Exploring the intent of the contracting parties often, but not always, involves marshaling facts extrinsic to the language of the contract document. When this need arises, these facts together with reasonable inferences extractable therefrom are superimposed on the ambiguous words to reveal the parties' discerned intent."); Syl. Pt. 1, *Martin v. Consol. Coal & Oil Corp.*, 101 W. Va. 721, 133 S.E. 626 (1926) ("The general rule as to oil and gas leases is that such contracts will generally be liberally construed in favor of the lessor, and strictly as against the lessee.").

For the foregoing reasons, we believe that the reformulated certified question presents issues which may only be answered by the district court and a factfinder, as appropriate, and not by this Court. Accordingly, we decline to answer the reformulated certified question.

22

## IV.  CONCLUSION

Based upon our analysis, we answer the certified questions as follows:

Question One:    Is *Estate of Tawney v. Columbia Natural Resources, LLC.*, 219 W. Va. 266, 633 S.E.2d 22 (2006), still good law in West Virginia?

Answer:    Yes.

Question Two:    What level of specificity does *Tawney* require of an oil and gas lease to permit the deduction of post-production costs from a lessor's royalty payments, and if such deductions are permitted, how are the deductions to be calculated?

Answer:    We decline to answer the reformulated certified question because it presents a question of contract interpretation which may only be answered by referencing the individual lease and applicable principles of law.

Certified Questions Answered.